**PHILADELPHIA FEDERATION OF TEACHERS, AFT, Local 3, AFL–CIO and Jerry Jordan**

v.

**SCHOOL DISTRICT OF PHILADELPHIA, the School Reform Commission, William J. Green, Feather Houstoun, Fara Jimenez, Marjorie Neff, and Sylvia Simms, in their official capacities as Members of the School Reform Commission, and Dr. William R. Hite, Jr., in his official capacity as the Superintendent of Schools, School District of Philadelphia, Appellants.**

Commonwealth Court of Pennsylvania.

Argued Dec. 10, 2014.

Decided Jan. 22, 2015.

---

Mark A. Aronchick, Philadelphia, for appellants.

Ralph J. Teti, Philadelphia, for appellees.

BEFORE: DAN PELLEGRINI, President Judge, BONNIE BRIGANCE LEADBETTER, Judge, ROBERT SIMPSON, Judge, MARY HANNAH LEAVITT, Judge, and PATRICIA A. McCULLOUGH, Judge.

OPINION BY Judge McCULLOUGH.

Appellants, the School District of Philadelphia (District); the School Reform Commission, William J. Green, Feather Houstoun, Fara Jimenez, Marjorie Neff, and Sylvia Simms, in their official capacities as members of the School Reform Commission (collectively, the SRC); and Dr. William R. Hite, Jr., in his official capacity as the District's Superintendent of Schools, appeal from the October 27, 2014 order of the Court of Common Pleas of Philadelphia County (trial court) permanently enjoining Appellants from taking any unilateral action to implement changes or modifications to the benefits of bargaining unit employees represented by the Philadelphia Federation of Teachers (PFT). For reasons different from those relied on by the trial court as stated below, we affirm.

**Facts and Procedural History**

On December 21, 2001, in light of a $200 million operating shortfall in the School District of Philadelphia's (District) $2 billion budget at the commencement of the 2001–02 school year, the Secretary of Education issued a declaration finding the District to be in financial distress. Consistent with section 696 of the Public School Code of 1949 (School Code), Act of March 10, P.L. 30, added by the Act of April 27, 1998, P.L. 270, *as amended,* 24 P.S. § 6–696, the SRC was established,[1] all powers and duties of the board of school directors were suspended, and the SRC assumed control of the operation, management, and educational program of the District.[2]

Following the appointment of the SRC, the District and PFT were parties to at least two collective bargaining agreements (CBAs) and two one-year extensions. The latest CBA was effective from September 1, 2009, through August 31, 2012, and was extended for one year through August 31, 2013. Prior to its expiration, in January of 2013, the District and PFT began negotiations with respect to a new CBA. However, the parties were unable to agree to terms that were satisfactory to each side.

On October 6, 2014, the SRC voted unanimously to adopt Resolution SRC–1, cancelling the District's expired CBA with PFT. This Resolution further authorized the District to impose new economic terms and conditions regarding certain fringe benefits and one wage term. Resolution SRC–1 stated, in pertinent part, that the SRC "pursuant to section 693(a)(1) of the School Code, incorporated in section 696(i) of the School Code, in order to effectuate needed economies in the operation of the School District's schools, hereby authorizes and directs the School District . . . to make specific limited changes and to implement

---

1. Section 696(a) provides that, "[w]ithin thirty (30) days of a declaration by the Secretary of Education that a school district of the first class is distressed under section 691(c), a School Reform Commission shall be established consisting of four members initially appointed by the Governor and one member initially appointed by the mayor of the city coterminous with the school district." 24 P.S. § 6–696(a).

2. Section 696(e)(1) of the School Code, 24 P.S. § 6–696(e)(1).

... modified economic terms and conditions for employees in the bargaining unit represented by the PFT, consistent with economic terms proposed in negotiations...." (Reproduced Record (R.R.) at 230a.) Further, Resolution SRC–1 stated that the SRC "hereby cancels the most recent [CBA] between the School District and the PFT to the extent it continues to govern the parties' relations...." *Id.*

The District sought to impose changes to nine terms of employment, the majority of which focused on employee cost-sharing for health benefits and were estimated to save the District nearly $44 million for the 2014–2015 fiscal year and $198 million over a four-year period. Under prior CBAs, the District paid 100% of the monthly premiums for medical coverage of PFT members, including additional charges for employees' spouses who could have obtained health insurance paid for in whole or in part by their own employers. The medical plan was a customized personal choice plan from Independence Blue Cross known as the 20/30/70 plan. Additionally, the District contributed $4,353.00 per employee per year to PFT's Health and Welfare Plan, which administered and provided dental, optical, and prescription drug benefits to members of PFT's bargaining unit as well as retirees.

As part of the new terms, the District switched from the 20/30/70 plan to the Modified Personal Choice 320 plan (320 plan). Employees could opt to stay with the 20/30/70 plan, but they would be responsible for paying the difference in the plan premiums. The 320 plan, with a few exceptions, would provide the same medical coverage as the 20/30/70 plan but would increase the employees' share of the cost

through co-pays, deductibles, and co-insurance. In addition, employees in PFT's bargaining unit would be required to contribute between 5% and 13% of the costs of the 320 plan, depending on the size of their salaries, and pay a surcharge of $70.00 per month for spouses who declined coverage offered by their own employers. Further, the new terms eliminated the previously paid opt-out credit for employees who chose not to enroll in the medical benefits plan, eliminated contributions to PFT's Health and Welfare Fund, and replaced the same with a District-administered plan for dental, optical, and prescription drug benefits.

Finally, the new terms instituted a uniform *per diem* rate for substitute teachers, eliminated contributions to PFT's Legal Fund, which provided certain legal services free of charge to members, reduced paid sick leave and short-term disability leave, and reduced the amount of termination pay benefits.

On October 16, 2014, PFT and its president, Jerry Jordan, filed a complaint and petition for a temporary restraining order and preliminary injunctive relief with the trial court. The complaint alleged that the SRC's cessation and/or modification of benefits for bargaining unit employees was a direct violation of the expired CBA and that there is no language in the CBA or any statute which grants the SRC the unilateral authority to cancel and/or modify existing benefits for bargaining unit members. The complaint also alleged that an injunction was necessary to preserve the *status quo* while the parties proceed to arbitration and/or proceed with an unfair labor practice charge filed with the Pennsylvania Labor Relations Board (PLRB).[3]

3. On October 16, 2014, PFT filed a demand for immediate arbitration with the American Arbitration Association as well as an unfair labor practice charge with the PLRB, assert- ing that the SRC's actions were in violation of the parties' CBA and the Public Employe Relations Act (PERA), Act of July 23, 1970, P.L. 563, *as amended*, 43 P.S. §§ 1101.101–

The sole relief sought by PFT in the complaint was the issuance of an injunction halting implementation of the changes announced by the SRC. Following an evidentiary hearing on October 20, 2014, which included testimony from Jordan, president of PFT; Cheryl Logan, assistant superintendent for forty-four schools in the District; Naomi Wyate, chief talent officer for the District; and Sophie Bryan, an employee of the superintendent's office and a member of the District's bargaining team, the trial court issued an order granting the preliminary injunction. The SRC promptly filed a notice of appeal.

Shortly thereafter, the parties submitted a stipulation to the trial court to convert the preliminary injunction to a permanent injunction but maintain the SRC's rights of appeal. The stipulation further provided that PFT would hold the unfair labor practice charges that they had filed with the PLRB in abeyance and would not proceed with an arbitration demand pending the outcome of the appeal. Consistent with the stipulation, on October 27, 2014, the trial court issued an order permanently enjoining the SRC from taking any unilateral action to implement modifications to the benefits and terms and conditions of employment of bargaining unit members as sought by the passage of SRC-1. The SRC immediately filed a second notice of appeal. On October 29, 2014, this Court issued an order expediting the briefing schedule and directing that the matter be listed for oral argument before the Court *en banc* on December 10, 2014.

In a statement of matters complained of on appeal, the SRC argued that the trial court erred by granting injunctive relief where PFT failed to show a clear right to relief on the merits. More specifically, the SRC alleged that it "had the power to effect needed economies in the operation of the ... District's schools, pursuant to 24 P.S. § 6-696 and 24 P.S. § 6-693(a)(1) ... by cancelling the [CBA] between the [District] and the PFT ... and unilaterally imposing on the PFT and the employees in the PFT bargaining units the nine new economic terms and conditions described in SRC-1...." [4] The SRC also alleged that PERA does not bar or limit its right to cancel the CBA and unilaterally impose new economic terms and conditions because section 28(a) of Act 46 of 1998, which added section 696 to the School Code, repealed PERA to the extent it was inconsistent with Act 46. Around the same time, the SRC filed a praecipe to withdraw its earlier notice of appeal.

On November 3, 2014, the trial court issued an opinion in support of its order, noting that section 696 of the School Code states that the SRC is given the powers stated therein as well as those enumerated in section 693, but provides that the section 693 powers must be exercised within 60 days of its creation. The trial court noted that since the District was declared in distress in December 2001, the 60-day

1101.2301. Regarding arbitration, we note that section 1127-A of the School Code, added by the Act of July 9, 1992, P.L. 403, 24 P.S. § 11-1127-A, provides that "[a]ny school district of the first class with an appointed school board and the public employes of that school district ... shall comply with and be subject to the binding arbitration provisions of [PERA]...." In *Pennsylvania School Boards Association v. Commonwealth Association of School Administrators, Teamsters Local*

502, 569 Pa. 436, 805 A.2d 476, 481 (2002), our Supreme Court "recognized that the Philadelphia School District constituted a school district of the first class and had been governed by appointive officers rather than elected ones since its creation."

4. Section 693 of the School Code was added by the Act of December 15, 1959, P.L. 1842, *as amended*, 24 P.S. § 6-693.

period had long since passed.[5] Acknowledging that the language of section 693(a)(1) includes the power to "cancel or renegotiate any contract other than teachers' contracts," 24 P.S. § 6-693(a)(1), the trial court, citing "a long line of case law," (Trial court op. at 10), to form the basis of its interpretation that the phrase "teachers' contracts" in section 693(a)(1) includes CBAs, rejected the SRC's contrary assertion that the phrase only referred to the individual contracts of tenured teachers. Noting that section 696 of the School Code empowers the SRC to negotiate a new CBA, the trial court found nothing in that section authorizing the SRC to cancel a CBA. Finally, the trial court concluded that PERA was not inconsistent with section 696.

## Discussion

■ On appeal,[6] the SRC reiterates its argument that the trial court erred in concluding that PFT had a clear right to relief on the merits because the SRC was statutorily authorized to cancel the CBA and impose new terms in order to effect needed economies in the District. We must disagree, for reasons other than those advocated by the trial court.

■ We begin by addressing the relevant statutory provisions. Generally, the collective bargaining process between all public employers and public employees is governed by PERA. PERA, passed in 1970, gave rank-and-file public employees, including professional employees such as teachers, the right to be represented by unions, to negotiate contracts, and to strike in the event of an impasse. *Curley v. Board of School Directors*, 163 Pa. Cmwlth. 648, 641 A.2d 719, 724-25 (1994). Indeed, PERA defined the framework for collective bargaining by the vast majority of public employees in the Commonwealth.[7] As the SRC states in its brief, "[t]he right of public employees to bargain collectively with their employers is statutorily granted and the contours of that right, the matters made subject to bargaining, and other rights and duties of the parties are up to the General Assembly to decide," which it did with PERA. (SRC Brief at 28.)

Section 701 of PERA addresses mandatory subjects of bargaining, providing as follows:

> Collective bargaining is the performance of the mutual obligation of the public employer and the representative of the public employes to meet at reasonable times and confer in good faith with re-

5. While we need not address this issue in detail given our affirmance on other grounds below, we note our disagreement with the trial court's interpretation of this provision as limiting the SRC to a time period of 60 days within which to exercise its powers. Such a limitation is not practical. As this case evidences, it may take years for a special board of control or the SRC to repair a distressed school district. Moreover, it appears that this limitation applied to the time period within which a school district's board of directors must comply with the directives of a special board of control to revise a budget.

6. Our scope of review of the grant or denial of a final or permanent injunction is limited to determining whether the trial court commit-

ted an error of law. *Buffalo Township v. Jones*, 571 Pa. 637, 813 A.2d 659 (2002), *cert. denied*, 540 U.S. 821, 124 S.Ct. 134, 157 L.Ed.2d 41 (2003). To establish a claim for a permanent injunction, a party must establish his or her clear right to relief. *Id.* However, unlike a claim for a preliminary injunction, the party need not establish either irreparable harm or immediate relief and a court may issue a final injunction if such relief is necessary to prevent a legal wrong for which there is no adequate redress.

7. The act commonly referred to as Act 111, Act of June 24, 1968, P.L. 237, 43 P.S. §§ 217.1-217.10, governs collective bargaining by police and firefighters, while PERA governs all other public employees.

spect to wages, hours and other terms and conditions of employment, or the negotiation of an agreement or any question arising thereunder and the execution of a written contract incorporating any agreement reached but such obligation does not compel either party to agree to a proposal or require the making of a concession.

43 P.S. § 1101.701.

Section 702 of PERA sets forth matters not subject to bargaining, stating that:

Public employers shall not be required to bargain over matters of inherent managerial policy, which shall include but shall not be limited to such areas of discretion or policy as the functions and programs of the public employer, standards of services, its overall budget, utilization of technology, the organizational structure and selection and direction of personnel. Public employers, however, shall be required to meet and discuss on policy matters affecting wages, hours and terms and conditions of employment as well as the impact thereon upon request by public employe representatives.

43 P.S. § 1101.702. It is relevant to our analysis to note that section 28(a) of Act 46 of 1998, the purpose and scope of which is discussed below, repealed PERA only to the extent that it was inconsistent with the revised provisions of the School Code, it did not repeal PERA in its entirety.[8]

Section 801 of PERA addresses a collective bargaining impasse, stating as follows:

If after a reasonable period of negotiation, a dispute or impasse exists between the representatives of the public employer and the public employes, the parties **may** voluntarily submit to mediation but if no agreement is reached between the parties within twenty-one days after negotiations have commenced, but in no event later than one hundred fifty days prior to the 'budget submission date,' and mediation has not been utilized by the parties, both parties **shall** immediately, in writing, call in the service of the Pennsylvania Bureau of Mediation.

43 P.S. § 1101.801 (emphasis added).

Section 803 of PERA states that "if the representatives of either or both the public employes and the public employer refuse to submit to the procedures" set forth in section 801, "such refusal shall be deemed a refusal to bargain in good faith" and could lead to the filing of unfair labor practice charges by a party or by the PLRB on its own.[9] 43 P.S. § 1101.803. There is no dispute that the SRC and PFT have continued to bargain in good faith over the past 21 months towards a new CBA and that neither party has declared that the negotiations have reached a point of impasse. Rather, the parties simply continued working towards a new CBA, at least until the SRC passed Resolution SRC–1.

Further, Section 804 of PERA states that "[n]othing in this article shall prevent the parties from submitting impasses to voluntary binding arbitration with the proviso the decisions of the arbitrator which

8. As the SRC notes in its brief, this particular section of Act 46 is not codified in Purdon's.

9. Section 1201(a)(5) of PERA specifically prohibits public employers from "[r]efusing to bargain collectively in good faith with an employe representative which is the exclusive representative of employes in an appropriate unit, including but not limited to the discussing of grievances with the exclusive represen-

tative." 43 P.S. § 1101.1201(a)(5). Section 1201(b)(3) likewise prohibits employee organizations/representatives from "[r]efusing to bargain collectively in good faith with a public employer, if they have been designated in accordance with the provisions of this act as the exclusive representative of employes in an appropriate unit." 43 P.S. § 1101.1201(b)(3).

would require legislative enactment to be effective shall be considered advisory only." 43 P.S. § 1101.804. At no time prior to the passage of Resolution SRC-1 did the SRC, PFT, or the Board, on its own motion, file an unfair labor practice charge or submit the matter to voluntary binding arbitration.[10]

### Section 693 of the School Code— Special Board of Control

However, even before PERA was enacted, special rules applied to financially distressed school districts. In 1959, the General Assembly passed what is commonly referred to as the Distressed School Law,[11] which amended the School Code to provide for special boards of control to govern school districts found to be financially distressed by the predecessor to the Secretary of Education. Section 693 was added to the School Code at this time and granted a special board of control the following powers:

(a) Except as otherwise provided in subsection (b), when the special board of control assumes control of a distressed school district, it shall have power and is hereby authorized to exercise all the rights, powers, privileges, prerogatives

and duties imposed or conferred by law on the board of school directors of the distressed district, and the board of school directors shall have no power to act without the approval of the special board of control. In addition thereto, the special board of control shall have power to require the board of directors within sixty (60) days to revise the district's budget for the purpose of effecting such economies as it deems necessary to improve the district's financial condition. To this end the special board of control may require the board:

(1) To cancel or to renegotiate any contract other than teachers' contracts to which the board or the school district is a party, if such cancellation or renegotiation of contract will effect needed economies in the operation of the district's schools.

. . .

(5) To dispense with the services of such nonprofessional employes as in his judgment are not actually needed for the economical operation of the school system.

(6) To suspend, in accordance with the provisions of section 1124 [12] of ·

---

10. As noted above, PFT only demanded arbitration and filed an unfair labor practice charge against the SRC after passage of this Resolution.

11. Act of December 15, 1959, P.L. 1842, *as amended,* 24 P.S. §§ 6-691-6-695.

12. Section 1124 of the School Code addresses the causes for suspension for professional employees, stating as follows:
 (a) Any board of school directors may suspend the necessary number of professional employes, for any of the causes hereinafter enumerated:
 (1) substantial decrease in pupil enrollment in the school district;
 (2) curtailment or alteration of the educational program on recommendation of the superintendent and on concurrence by

the board of school directors, as a result of substantial decline in class or course enrollments or to conform with standards of organization or educational activities required by law or recommended by the Department of Public Instruction;
(3) consolidation of schools, whether within a single district, through a merger of districts, or as a result of joint board agreements, when such consolidation makes it unnecessary to retain the full staff of professional employes; or
(4) when new school districts are established as the result of reorganization of school districts pursuant to Article II., subdivision (i) of this act, and when such reorganization makes it unnecessary to retain the full staff of professional employes.
24 P.S. § 11-1124(a)(1)-(4).

the act to which this is an amendment, such number of professional and temporary professional employes as may be necessary to maintain a pupil-teacher ratio of not less than twenty-six pupils per teacher for the combined elementary and secondary school enrollments.

24 P.S. § 6–693(a)(1), (5)-(6). The SRC contends that authority to cancel a contract under section 693(a)(1) includes the authority to cancel a CBA, that a CBA is not an exempted "teachers' contract" under that section, and that such authority must impliedly include the ability to impose new terms and conditions of employment.

### Section 696 of the School Code— School Reform Commission

The next significant amendment to the School Code regarding distressed school districts was in 1998 with Act 46, which set up a framework to give the Commonwealth an expanded role in the governance of financially distressed school districts of the first class, and included the addition of section 696. As noted above, section 696(a) provided for the establishment of a school reform commission within 30 days of a declaration by the Secretary of Education that a school district of the first class was distressed. Section 696(a)-(b.2) sets forth the procedure for appointment of members to such a commission and terms relating thereto, including terms regarding the duration of service, removing a member, filling a vacancy, appointing an interim chairman, and permitting reimbursement for expenses. Section 696(e) formally suspended the powers and duties

of the board of school directors of a school district of the first class and placed all responsibility for the operation, management, and educational program of the school district in the hands of the school reform commission.[13]

### Section 696(i)—Powers of School Reform Commission

Section 696(i) set forth 14 specific powers granted to the school reform commission, including the following:

In addition to all powers granted to the superintendent by law and a special board of control under section 693 and notwithstanding any other law to the contrary, the School Reform Commission shall have the following powers:

(1) To appoint such persons and other entities as needed to conduct fiscal and performance audits and other necessary analyses.

(2) To enter into agreements with persons or for-profit or nonprofit organizations to operate one or more schools. A school operated under this clause shall be funded in accordance with the terms of the agreement.

. . .

(3) To suspend the requirements of this act and regulations of the State Board of Education except that the school district shall remain subject to those provisions of this act set forth in sections 1073, 1073.1, 1076, 1077, 1078, 1080, 1732–A(a), (b) and (c), 1714–B and 2104 and regulations under those sections.

(4) To employ professional and senior management employes who do not hold State certification if the School Reform

---

13. Section 696(e)(1) states that "[t]he School Reform Commission shall be responsible for the operation, management and educational program of the school district of the first class. The powers and duties of the board of school directors of a school district of the first class shall be suspended. All powers and duties granted heretofore to the board of school directors ... shall be vested in the School Reform Commission...." 24 P.S. § 6–696(e)(1).

Commission has approved the qualifications of the person at a salary established by the commission.

(5) To enter into agreements with persons or for-profit or nonprofit organizations providing educational or other services to or for the school district. Services provided under this clause shall be funded in accordance with the terms of the agreement.

(6) Notwithstanding any other provisions of this act, to **close or reconstitute a school, including the reassignment, suspension or dismissal of professional employes.**

(7) To **suspend professional employes without regard to the provisions of section 1125.1.**[14]

(8) To appoint managers, administrators or for-profit or nonprofit organizations to oversee the operations of a school or group of schools within the school district.

(9) To reallocate resources, amend school procedures, develop achievement plans and implement testing or other evaluation procedures for educational purposes.

(10) To supervise and direct principals, teachers and administrators.

(11) To negotiate any memoranda of understanding under the collective bargaining agreement in existence on the effective date of this section.

(12) To negotiate a new collective bargaining agreement.

(13) To delegate to a person, including an employe of the school district or a for-profit or nonprofit organization, powers it deems necessary to carry out the purposes of this article, subject to the supervision and direction of the School Reform Commission.

(14) To employ, contract with or assign persons or for-profit or nonprofit organizations to review the financial and educational programs of school buildings and make recommendations to the School Reform Commission regarding improvements to the financial or educational programs of school buildings.

24 P.S. § 6–696(i)(1)–(14) (emphasis added).

### Section 696(k)—Collective Bargaining and the SRC

Further, section 696(k) of the School Code altered the landscape for collective bargaining as it pertains to distressed school districts of the first class, providing as follows:

(k) **Collective bargaining between employes and the school district of the first class *shall* be conducted in accordance with this subsection.** For purposes of collective bargaining, as used in section 693 and this section: 'professional employe' shall have the meaning given in section 1101(1), and 'teacher' shall have the meaning given in section 1202–A.[15]

14. The specific powers granted to the SRC in section 696(i)(6) and (7) exceed the limited power granted to a special board of control under section 693(a)(6) to only suspend professional and temporary professional employees in accordance with the provisions of section 1124 of the School Code.

15. Section 1101(1) of the School Code defines a "professional employe" to include "those who are certificated as teachers, supervisors, supervising principals, principals, assistant principals, vice-principals, directors of vocational education, dental hygienists, visiting teachers, home and school visitors, school counselors, child nutrition program specialists, school librarians, school secretaries the selection of whom is on the basis of merit as determined by eligibility lists and school nurses. 24 P.S. § 11–1101(1). Section 1202–A was repealed by the Act of December 23, 2003, P.L. 304, and was not replaced.

. . .

(2) No distressed school district of the first class shall be required to engage in collective bargaining negotiations or enter into memoranda of understanding or other agreements regarding any of the following issues:

(i) Contracts with third parties for the provision of goods or services, including educational services or the potential impact of such contracts on employes.

(ii) Decisions related to reductions in force.

(iii) Staffing patterns and assignments, class schedules, academic calendar, places of instruction, pupil assessment and teacher preparation time.

. . .

(3) A collective bargaining agreement for professional employes entered into after the expiration of the agreement in effect on the date of the declaration of distress shall provide for the following:

(i) A school day for professional employes that is equal to or exceeds the State average as determined by the department. An extension of the school day resulting from this requirement shall be used exclusively for instructional time for students.

(ii) The number of instructional days shall be equal to or exceed the State average number of instructional days.

(iii) The [SRC] shall not increase compensation for employes solely to fulfill the requirements under subparagraphs (i) and (ii).

(4) A provision in any contract in effect on the date of the declaration of distress under this subsection that is in conflict with this subsection shall be discontinued in any new or renewed contract.

(5) Except as specifically provided in section 693, nothing in this subsection shall eliminate, supersede or preempt any provision of an existing collective bargaining agreement until the expiration of the agreement unless otherwise authorized by law.

(6) If upon the termination of a collective bargaining agreement in effect on the date of the declaration of distress under this section a new collective bargaining agreement has not been ratified, the [SRC] shall establish a personnel salary schedule to be used until a new agreement is ratified.

24 P.S. § 6–696(k)(2)(i)–(iii), (3)-(6) (emphasis added).[16] This section clearly conveys that distressed first-class school districts shall engage in collective bargaining, but not regarding third-party contracts, decisions related to reductions in force, and staffing patterns and assignments. It provides for certain items that must be included in a new CBA entered into after expiration of the CBA in effect on the date of the declaration of distress and permits the SRC, subject to section 693 and upon expiration of a CBA, to impose a temporary personnel salary schedule, even while *status quo* negotiations continue. However, this section does not give the SRC the right to cancel a CBA or unilaterally impose new terms.

Further amendments in 2001, prior to the Secretary of Education's declaration of financial distress in this case, repealed section 696(k)(1) of the School Code, which stated that "[w]hether or not a declaration of distress has been made under section 691(c), a [CBA] in effect on the effective

16. Additionally, section 696(*l*) prohibited school employees in distressed first-class school districts under the direction of the SRC from engaging in strikes. 24 P.S. § 6–696(*l*).

date of this section **shall not be extended and shall have no force or effect beyond the existing term of the contract** notwithstanding any other law to the contrary." 24 P.S. § 6–696(k)(1) (emphasis added) (repealed by the Act of June 22, 2001, P.L. 530). The repeal of this section, which seemingly would have excused the SRC from having to maintain the *status quo* after expiration of a CBA, indicates clear intent by the legislature not to alter the *status quo* requirement.

### The *Status Quo* and an Impasse

Both this Court and our Supreme Court have recognized a duty in the parties to maintain the *status quo* when a CBA expires and no successor agreement is in place. *Luzerne Intermediate Unit No. 18 v. Luzerne Intermediate Unit Education Association*, 89 A.3d 319 (Pa.Cmwlth. 2014), citing *Fairview School District v. Unemployment Compensation Board of Review*, 499 Pa. 539, 454 A.2d 517, 521 (1982) ("The underlying rationale for the *status quo* requirement is that during the interim period between contracts, the employer may continue operations and the employee may continue working, while the parties are free to negotiate on an equal basis in good faith. Maintenance of the *status quo* is merely another way of stating that the parties must continue the existing relationship in effect at the expiration of the old contract.")

■ Nevertheless, the *status quo* need not continue in perpetuity. As our Supreme Court noted in *Norwin School District v. Belan*, 510 Pa. 255, 507 A.2d 373, 379–80 (1986), while an employer has a duty to maintain *status quo* conditions under the expired collective bargaining agreement while negotiations continue, an employer is relieved of this duty in the event of an impasse during the collective bargaining process. While *Norwin* ulti- mately involved a determination whether employees engaged in a work stoppage were entitled to unemployment compensation benefits, it provides a significant discussion regarding the collective bargaining process and an employer's unilateral changes to the terms and conditions of employment following expiration of a CBA.

In *Norwin*, Norwin School District (Norwin) and the Norwin Education Association (NEA), which represented Norwin's teachers, were parties to a CBA that expired on August 31, 1981, and included medical coverage for bargaining unit members provided by Blue Cross/Blue Shield. In September 1980, Norwin passed a resolution indicating its intent to replace the Blue Cross/Blue Shield plan with a self-insurance plan with equivalent coverage. The NEA filed a grievance alleging that the coverage was not equivalent and, hence, Norwin was in violation of the CBA. The grievance was submitted to arbitration. In the interim, the parties began negotiations for a new CBA.

In April 1981, Norwin adopted a resolution which substituted a plan called Alpha Health Care Plan for the Blue Cross/Blue Shield coverage, and this plan was implemented on July 1, 1981. As the grievance arbitration continued, the NEA notified Norwin on August 18, 1981, that it would continue to work beyond the CBA expiration date as long as Norwin maintained the same terms and conditions of employment that existed prior to the implementation of the Alpha Health Care Plan. On August 24, 1981, the arbitrator sustained the NEA's grievance and directed Norwin to immediately reinstate the Blue Cross/Blue Shield coverage or its equivalent. Norwin notified the NEA on August 29, 1981, of its intent to appeal the arbitrator's award. On September 1, 1981, the NEA commenced a work stoppage. Norwin thereafter advised the NEA that it would rein-

state the Blue Cross/Blue Shield coverage after its members returned to the classroom.[17]

During this work stoppage, the NEA members submitted claims for unemployment compensation benefits. Upon review by the Office of Employment Security, these claims were initially denied. A referee reversed this decision and granted benefits on the basis that the members' unemployment was the result of a labor dispute that constituted a lockout. The Unemployment Compensation Board of Review (Board) and this Court both affirmed the referee's decision and Norwin appealed to our Supreme Court, which affirmed this Court's decision.

In reviewing whether the work stoppage was caused by the union or by management, the Supreme Court first noted that a determination of whether the two health plans offered by Norwin were equivalent was essential for ascertaining whether the *status quo* was maintained as required by its decision in *Appeal of Cumberland Valley School District*, 483 Pa. 134, 394 A.2d 946 (1978). In *Appeal of Cumberland Valley School District*, our Supreme Court held that a public employer violated its duty to bargain under PERA by unilaterally discontinuing payment for various insurance benefits and other terms and conditions of employment that were provided

in the parties' expired CBA. This principle has since been commonly referred to as the "Cumberland Doctrine" and was derived from federal decisional law. *See National Labor Relations Board v. Katz*, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962); *Hinson v. National Labor Relations Board*, 428 F.2d 133 (8th Cir.1970). We explained in *Appeal of Cumberland Valley School District* that "[t]his basic policy was designed to encourage the continuation of the work relationship for a meaningful and reasonable period of time under terms previously and mutually agreed to by the parties during the difficult period between the expiration of the old agreement and before the new terms of employment have been agreed upon." *Id.* at 378 n. 7.[18]

The Court noted that the Board found Norwin's Alpha Health Care Plan to be not equivalent to the Blue Cross/Blue Shield coverage, and, thus, the latter constituted the *status quo* with respect to health care coverage under the parties' expired CBA. The Court concluded that Norwin "had a duty not to unilaterally disturb *status quo* conditions under the expired collective bargaining agreement while negotiations continued." *Id.* at 379. The Court noted that an **employer is relieved of this duty only in the event of an impasse during the collective bar-**

---

17. On October 30, 1981, the parties agreed to a new CBA which included restoration of the Blue Cross/Blue Shield coverage. On November 3, 1981, all teachers returned to work.

18. This "Cumberland Doctrine" was followed by our Supreme Court in *Pennsylvania Labor Relations Board v. Williamsport Area School District*, 486 Pa. 375, 406 A.2d 329 (1979), wherein the Court reversed a decision of this Court and held that the Williamsport Area School District's unilateral implementation of changes in the terms and conditions of employment, i.e., failing to process a grievance under the terms of an expired CBA, and

thereby altering the *status quo*, constituted an unfair labor practice under PERA. In this regard, the Court stated that "[t]o allow such unilateral changes from the *status quo* is not to foster labor peace," *id.* at 331–32, and seriously undermines the authority of bargaining unit members to freely bargain. The Court noted that "[t]he collective bargaining process is fundamental to the policies of [PERA]" and that "[g]ood faith bargaining would be impossible if the *status quo* as to the terms and conditions of employment were not maintained while the employes continue to work." *Id.* at 332.

**gaining process.** The Court defined an "impasse" as "that point at which the parties have exhausted the prospects of concluding an agreement and further discussions would be fruitless," but stressed that "its application can be difficult." *Id.* at 380 n. 9. The Court recognized that Norwin had not raised on appeal, nor did the record reflect, that the bargaining obligation was extinguished by a bargaining impasse.

The Court went on to state that "[g]iven the many factors commonly itemized by the [National Labor Relations] Board and courts in impasse cases, perhaps all that can be said with confidence is that an impasse is a state of facts in which the parties, despite the best of faith, are simply deadlocked." *Id.* Indeed, "[a]n employer may, after bargaining with the union to a deadlock or impasse on an issue, make unilateral changes that are reasonably comprehended within his pre-impasse proposals.... Another formulation is that after an impasse reached in good faith, the employer is free to institute by unilateral action changes which are in line with or which are no more favorable than those it offered or approved prior to impasse." *Id.* (citation omitted).

■ During oral argument, the SRC conceded that, even after 21 months of negotiations and more than 120 formal bargaining sessions between the SRC and PFT, **the parties had not reached a point of impasse.**[19] It is only upon reaching an impasse that an employer may make unilateral changes to a CBA. *Norwin School District.* Nevertheless, the SRC asserted that it had the statutory authority under

sections 693 and 696 of the School Code to cancel the CBA between the parties and impose new economic terms. Further, in its reply brief, the SRC equates the situation after a cancellation of a contract under section 693(a)(1), assuming that a contract includes a CBA, with "the situation after a *bona fide* impasse is reached pursuant to PERA, freeing the employer to impose terms." However, it appears that the SRC could have declared an impasse in this case under PERA and then imposed new terms and conditions of employment thereunder, but, instead, opted to cancel the CBA and unilaterally impose new terms and conditions under the purported authority of sections 693 and 696, neither of which expressly or impliedly provides the SRC with such authority.

## Powers under Sections 693 and 696

Section 693 sets forth six specific powers of a special board of control, including the power "(1) [t]o cancel or to renegotiate any contract other than teachers' contracts ... (2) [t]o increase tax levies ... (3) [t]o appoint a special collector of delinquent taxes ... (4) [t]o direct the special school auditors of the department or to appoint a competent independent public accountant ... (5) [t]o dispense with the services of such nonprofessional employees as in his judgment are not actually needed ... (6) to suspend, in accordance with the provisions of section 1124 of the act ... such number of professional and temporary professional employees as may be necessary...." 24 P.S. § 6–693(a)(1)–(6). The SRC contends that the right to cancel a

---

19. In a memorandum of law filed with the trial court in opposition to PFT's petition for a preliminary injunction, the SRC noted that, in accordance with section 801 of PERA, a mediator from the Pennsylvania Bureau of Mediation has participated in the negotiations since 2013. *See* R.R. at 307a. The SRC also stated to the trial court that the parties were

at an impasse. *Id.* However, the Court accepts the SRC's assertion that the parties are not at an impasse for purposes of this appeal and we need not address the issue further due to this assertion and because no statement to the contrary was made by PFT during argument or raised by the parties in this appeal.

contract language in subsection (a)(1) implies a right to cancel an expired CBA. The SRC reasons that an employer's duty under PERA to honor the economic terms of an expired CBA while negotiations over a new CBA continue does not apply to a contract that has been cancelled. However, this section does not specifically empower a special board of control to cancel a CBA or to unilaterally impose new terms.

Although section 696(i), set forth in full above, grants 14 specific powers to the SRC, this section makes no mention of a power to cancel a CBA or to unilaterally impose new terms and conditions of employment. In order to reach this conclusion, the SRC would have the Court determine that the right to cancel a CBA and impose new terms is implied in the absence of an impasse. However, the School Code separately addresses contracts and CBAs throughout, and while the legislature has not seen fit to define the terms, if it intended that a contract and a CBA were one and the same, it would not reference them individually in the pertinent sections of the School Code, namely sections 693 and 696.

Moreover, a reading of sections 696(i) and (k) indicates that continued collective bargaining is contemplated between the SRC and PFT. For example, section 696(i)(11) empowers the SRC to "negotiate any memoranda of understanding under the [CBA] in existence on the effective date" of that section, and section 696(i)(12) empowers the SRC to "negotiate a new [CBA]." 24 P.S. § 6–696(i)(11), (12). Section 696(k) begins by stating that "[c]ollective bargaining between employes and the school district of the first class shall be conducted in accordance with this subsection" and proceeds in section 696(k)(2) to eliminate the requirement that a distressed, first-class school district bargain over certain subjects which, under PERA,

had been mandatory subjects of bargaining. These subjects included "(i) [c]ontracts with third parties for the provision of goods or services ... (ii) [d]ecisions related to reductions in force ... (iii) [s]taffing patterns and assignments, class schedules, academic calendars, places of instruction, pupil assessment and teacher preparation time." 24 P.S. § 6–696(k)(2)(i)–(iii).

Section 696(k)(3) addresses certain provisions that must be included in a CBA for professional employees which is "entered into after the expiration of the agreement in effect on the date of the declaration of distress," including the following:

(i) A school day for professional employes that is equal to or exceeds the State average as determined by the department. An extension of the school day resulting from this requirement shall be used exclusively for instructional time for students.

(ii) The number of instructional days shall be equal to or exceed the State average number of instructional days.

(iii) The School Reform Commission shall not increase compensation for employes solely to fulfill the requirements under subparagraphs (i) and (ii).

24 P.S. § 6–696(k)(3)(i)–(iii).

Moreover, section 696(k)(5) ensures the continued viability of a CBA by stating that "[e]xcept as specifically provided in section 693, nothing in this subsection shall eliminate, supersede or preempt any provision of an existing collective bargaining agreement until the expiration of the agreement unless otherwise authorized by law." 24 P.S. § 6–696(k)(5).

Sections 693(a)(5) and (6) address this exception by granting discretion to the SRC to dispense with the services of unnecessary nonprofessional employees and to suspend professional and temporary professional employees, thereby bypassing

certain provisions of the CBA, including Article IX(A)(1), which guarantees employment security to employees, both in terms of their employment with the District and at a specific location, (R.R. at 132a); Article IX(B), which prohibits layoffs except in cases of a projected decline in pupil enrollment, (R.R. at 134a); and Article IX(C), which prohibits the imposition of discipline or the discharge of any employee, other than a probationary employee, without just cause. (R.R. at 136a.) However, section 696(k)(5) does not, as the SRC contends, implicitly authorize the eliminating, superseding, or preempting of CBA provisions.

## Power to Cancel under Section 693(a)(1)

The SRC relies on section 693(a)(1), incorporated by reference via section 696, which provides a special board of control with the power "[t]o **cancel** or to renegotiate **any contract other than teachers' contracts** to which the board or the school district is a party, if such cancellation or renegotiation of contract will effect needed economies in the operation of the district's schools." 24 P.S. § 6–693(a)(1) (emphasis added). While it is undisputed that the SRC's actions were intended to "effect needed economies" in the operation of the District's schools, the parties disagree as

to whether the CBA is a teachers' contract.

To refute the SRC's cancellation of the expired CBA, PFT argues that the CBA is a "teachers' contract" which cannot be cancelled.[20] PFT cites several cases from this Court wherein we refer to a CBA as a teachers' contract. *See, e.g., Wyland v. Public School Employes' Retirement Board,* 669 A.2d 1098, 1100 (Pa.Cmwlth. 1996) (referring to CBA as a "teacher contract"); *Philadelphia Federation of Teachers, Local 3 v. Thomas,* 62 Pa.Cmwlth. 286, 436 A.2d 1228, 1234 (1981) (same); *Union City Area School District v. Unemployment Compensation Board of Review,* 61 Pa.Cmwlth. 494, 434 A.2d 239, 242 n. 2 (1981), *rev'd on other grounds,* 499 Pa. 548, 454 A.2d 522 (1982) ("The term 'teacher contract' refers to the [CBA], which covers all the claimants here involved."). PFT also asserts that, through PERA's grant of collective bargaining rights, individual employment contracts are subsumed into an existing CBA. *Leechburg Area School District v. Leechburg Education Association,* 475 Pa. 413, 380 A.2d 1203 (1977); *Tunkhannock Area School District v. Tunkhannock Area Education Association,* 992 A.2d 956 (Pa.Cmwlth.), *appeal denied,* 608 Pa. 626, 8 A.3d 347 (2010).[21]

The SRC counters that the term "teachers' contract" in section 693(a)(1) cannot

**20.** In *amicus* briefs, the Pennsylvania State Education Association and the Pennsylvania AFL–CIO support PFT's argument. The Pennsylvania AFL–CIO notes that it would be irrational to grant the SRC, on the one hand, the power to enter into new CBAs and, on the other hand, the power to cancel such agreements at any time and impose new terms of its choosing, as the latter power would make the former power illusory.

**21.** In *Leechburg,* the school district hired two new teachers pursuant to individual contracts which included salaries below the level guaranteed by the CBA. The teachers' union filed a grievance contending that the school district violated the CBA because these two teachers

were not being paid the salary to which they were entitled. The arbitrator ruled in favor of the union. This Court reversed the arbitrator's award, but our Supreme Court vacated our decision and reinstated the award. The Supreme Court held that "to allow individual contracts to interfere with the functioning of the [CBA] would reduce laws providing for collective bargaining to a futility." *Id.* at 1206. The Supreme Court reasoned that "[a] collective bargaining agreement would eventually become ineffective if a district could, over a period of years, hire new teachers, without adhering to the wage salary scale in the collective bargaining agreement. After a period of time, the same evils would be pres-

refer to CBAs, since that section was enacted in 1959, 11 years prior to PERA and the establishment of collective bargaining for public employees.[22] Rather, the SRC asserts that said term was meant to apply to the individual employment contracts that professional employees were required to execute with a school district under section 1121 of the School Code, 24 P.S. § 11–1121.[23] The SRC cites numerous Supreme Court cases prior to the enactment of section 693 which referred to these individual contracts as either a "teacher's contract" or "teachers' contracts." *See, e.g., Wilchenski v. Throop Borough School District,* 383 Pa. 394, 119 A.2d 510, 512 (1956) (referencing a "teacher's contract"); *Appeal of Watson,* 377 Pa. 495, 105 A.2d 576, 579 (1954), *cert. denied,* 348 U.S. 879, 75 S.Ct. 120, 99 L.Ed. 692 (1954) (same);

*McCandless Township v. Wylie,* 375 Pa. 378, 100 A.2d 590, 593 (1953) (same); *Teachers' Tenure Act Cases,* 329 Pa. 213, 197 A. 344, 353 (1938) (referencing "teachers' contracts"). The SRC also notes that, under sections 1122 and 1127, 24 P.S. §§ 11–1122, 11–1127, such contracts could not be terminated absent just cause, notice, and an opportunity for a hearing, thereby justifying the exclusion in section 693(a)(1).[24]

In any event, section 693(a)(1) is not controlling as it does not specifically address CBAs, override the relevant provisions of PERA, or empower the SRC to unilaterally impose new economic terms and conditions of employment.

### Legislative History

■ Coupled with this lack of statutory authority, we note that, contrary to the

---

ent which brought about the need for PERA." *Id.*

In *Tunkhannock,* the school district received federal grant funds and used those funds to hire four "special teachers," each of whom signed an agreement of understanding with the school district which noted that their employment was contingent upon receipt of federal grant monies, that they could be terminated at any time, and, that, if terminated, they would not have any additional employment rights within the district. The teachers' union thereafter filed a grievance seeking to have the "special teachers" retroactively hired as either temporary professional employees or professional employees receiving all the rights and benefits of other members of the collective bargaining unit. The arbitrator ruled in favor of the union. The school district filed a petition with the local common pleas court to vacate the arbitrator's award, but the same was denied. This Court ultimately affirmed the common pleas court's decision, citing the reasoning discussed above from *Leechburg* and holding that the CBA "trumps separate individual teacher contracts." *Id.* at 960.

Significantly, neither *Leechburg* nor *Tunkhannock* addressed whether a CBA is a "teachers' contract" under section 693(a)(1) of the School Code.

**22.** In *amicus* briefs, the Pennsylvania Department of Education and the Commonwealth Foundation for Public Policy Alternatives support the SRC's interpretation of section 693(a)(1), both stressing the extensive period of negotiations and the inability of the parties to agree to the terms of a new CBA.

**23.** Section 1121(a) states that "[i]n all school districts, all contracts with professional employes shall be in writing, in duplicate, and shall be executed on behalf of the board of school directors by the president and secretary and signed by the professional employe." 24 P.S. § 11–1121(a). Section 1121(c), 24 P.S. § 11–1121(c), sets forth the exact language to be included in this contract.

**24.** Section 1122 limited the valid causes for termination of a contract to immorality, incompetency, intemperance, cruelty, persistent negligence, mental derangement, and persistent and willful violation of school laws. Section 1127 required a board of school directors to furnish a professional employee with a detailed written statement of the charges upon which his proposed dismissal was based as well as an opportunity to be heard.

SRC's assertions, the power to cancel a CBA cannot be inferred from the legislative history that preceded the adoption/amendment of the pertinent provisions of the School Code. When the words of a statute are not explicit, section 1921(c)(7) of the Statutory Construction Act of 1972 permits the intention of the General Assembly to be ascertained by considering "[t]he contemporary legislative history." 1 Pa.C.S. § 1921(c)(7). Additionally, "[w]hile statements made by legislators during the enactment process are not dispositive of legislative intent, they may be properly considered as part of the contemporaneous legislative history." *Washington v. Baxter*, 553 Pa. 434, 719 A.2d 733, 738 (1998) (citation omitted).

PFT first claims that the statutory language at issue here is not ambiguous and, hence, we need not consider the applicable legislative history. Alternatively, PFT claims that during debate over the final version of Act 46 in 1998, then-Majority Leader Perzel, a chief sponsor of the legislation, rejected any interpretation of that Act as including the authority to cancel an expired CBA. PFT also claims that the 2001 amendments, which repealed section 696(k)(1) (providing that a CBA shall not be extended and shall have no force or effect beyond its existing term), removed the very authority which the SRC now asserts it has, i.e., authority to impose new economic terms and conditions of employment. PFT further notes that during discussion of Act 83 of 2001, which added the "[e]xcept as specifically provided in section 693" language to section 696(k)(5), multiple legislators addressed concerns regarding the impact of this amendment on the contracts of teachers and nonprofessional employees.[25]

The SRC asserts that PFT distorts the legislative history. Regarding the debate over Act 46, the SRC correctly notes that then-Majority Leader Perzel simply indicated that Act 46 had no effect on existing CBAs at that time.[26] Regarding the repeal of section 696(k)(1), the SRC asserts that the plain text of that provision refutes PFT's misconception that the same would have applied not just to contracts in effect upon the effective date of Act 46, but also to those negotiated later. The SRC also notes that by the time section 696(k)(1) was repealed in 2001, all of the CBAs in effect in 1998 had expired and had been renegotiated. Regarding the amendment

---

**25.** Indeed, during debate over this 2001 amendment, Representative Veon stated that:

> I think it is clear to me under reading this bill in front of us here tonight that in fact once again you could not negate the contract for a teacher in the city of Philadelphia under the language that is in front of us here tonight if this bill were to pass. But, Madam Speaker, also even a casual reading of·this bill … makes it very clear to me and I think very clear to anyone who would take a casual look at this part of the bill that you could in fact negate existing contracts for janitors, bus drivers, cafeteria workers.

House Legislative Journal, October 23, 2001, page 1899. Representative Veon later reiterated that "the language in this bill … would allow those contracts to be negated," referencing the contracts of janitors, bus drivers,

and cafeteria workers. *Id.* at 1900. Representative DeWeese similarly stated that "[i]f you vote to concur tonight, you are voting to lacerate the jobs of many hundreds of bus drivers and cafeteria workers," but that "the teachers will probably be protected except through attrition, and then those numbers will constrict." *Id.* at 1904. Senator Fumo exclaimed "[t]hank God, you protected the contracts of the teachers." Senate Legislative Journal, October 23, 2001, page 1013.

**26.** During this debate, then-Majority Leader Perzel was asked by Representative Taylor about the effect of Act 46 on "existing union contracts," to which he replied that "this does not abrogate the existing union contract whatsoever." House Legislative Journal, April 21, 1998, page 917.

to section 696(k)(5), the SRC asserts that the amendment was necessary given the inconsistency between that section and section 693(a)(1).

Nevertheless, nothing in this legislative history supports the SRC's position that it has the authority to cancel a CBA. Rather, it is clear from this legislative history that there was no discussion of the right to cancel a CBA, and that any discussion of the cancellation of contracts related to teachers' contracts and the contracts of nonprofessional employees, such a janitors, cafeteria workers, and bus drivers.

■ Further, we question whether the SRC's actions in this case even constitute a cancellation. Section 693 does not define the term "cancel." Our Supreme Court has defined a "cancellation" of a contract as "an act destroying the force and effectiveness of the contract, and is a form of prospective relief, affecting the future rights and obligations of the parties towards each other." *Klopp v. Keystone Insurance Companies,* 528 Pa. 1, 595 A.2d 1, 4 (1991) (quoting *Metropolitan Property & Liability Insurance Company v. Commonwealth,* 97 Pa.Cmwlth. 219, 509 A.2d 1346, 1348 (1986), *aff'd,* 517 Pa. 218, 535 A.2d 588 (1987)). Thus, cancellation of a contract means the end of any contractual relationship between the parties. In the present case, the SRC did not seek to "cancel" the entire CBA with PFT and end the contractual relationship. Rather, the SRC only sought to replace a select number of provisions therein.

Indeed, as noted above, section 701 of PERA provides that wages, hours, and other terms and conditions of employment are mandatory subjects of bargaining. Section 696(k) only modified this section of PERA by removing certain mandatory subjects from bargaining, such as third-party contracts for the provision of goods or services, including educational services or the potential impact of such contracts on employees (696(k)(2)(i)), decisions related to reductions in force (696(k)(2)(ii)), and staffing patterns and assignments, class schedules, academic calendar, places of instruction, pupil assessment, and teacher preparation time (696(k)(2)(iii)). However, the remainder of section 701 of PERA remains intact and viable, at least until the parties reach an impasse in negotiations, which the parties have disclaimed in this case.

Significantly, in its brief, the SRC concedes that, under PERA, a CBA continues to bind an employer and the union after expiration with respect to mandatory subjects of bargaining until a new agreement is reached or the parties reach an impasse. (Brief of SRC at 39.) Further, the SRC, citing *Pennsylvania State Park Officers Association v. Pennsylvania Labor Relations Board,* 854 A.2d 674, 680 (Pa. Cmwlth.2004), *appeal denied,* 582 Pa. 704, 871 A.2d 194 (2005), acknowledges that employers are barred from acting unilaterally with regard to such mandatory subjects after expiration of a CBA.

## 2012 Amendments to the School Code

Nonetheless, the SRC suggests that amendments to the School Code in 2012 further support a conclusion that section 693(a)(1) empowers it to cancel CBAs. These amendments added section 642–A to the School Code,[27] which sets forth the powers of a school district in financial recovery status or in receivership status. This section includes 18 enumerated powers, including the power to reopen the budget, convert school buildings to charter schools, increase tax levies, and eliminate unnecessary nonprofessional employees.

27. Added by the Act of July 12, 2012, P.L. 1142, 24 P.S. § 6–642–A.

Similar to section 693(a)(1), section 642–A(a)(3) includes the power to "[c]ancel or renegotiate any contract to which the board of school directors or the school district is a party, if the cancellation or renegotiation of contract will effect needed economies in the operation of the district's schools." 24 P.S. § 6–642–A(a)(3). However, this section further provides that "[c]ollective bargaining agreements are specifically exempt from this clause and shall be governed by the provisions of clause (15)." *Id.* Section 642–A(a)(15) empowers a school district in financial recovery status or in receivership status to "[n]egotiate a new [CBA] if the negotiation of a new [CBA] will effect needed economies in the operations of the district's schools." 24 P.S. § 6–642–A(a)(15). While this provision clearly allows a school district to negotiate a new CBA to effect needed economies, nowhere does it state that it may cancel the same or otherwise impose new terms and conditions to an expired CBA under which the parties are operating and maintaining the *status quo.* In the absence of an impasse, as previously discussed, to create such a right requires an act of the legislature which, to the contrary, has made it clear that no such right currently exists.

The SRC asserts that the failure to amend section 693(a)(1) to include this exemption evidences the General Assembly's intent that the SRC have the power to cancel CBAs, noting that "where the legislature includes specific language in one section of a statute and excludes it from another section, the language may not be implied where excluded.... Moreover, where a section of a statute contains a given provision, the omission of such a provision from a similar section is significant to show a different legislative intent."

*Commonwealth v. Mazzetti,* 615 Pa. 555, 44 A.3d 58, 67 (2012).[28]

Initially, we note that these sections apply to two very distinct groups. Section 693(a) only applies to first class school districts; whereas section 642–A applies to all other classes of school districts. Additionally, section 693(a)(1), by its very terms, only excludes "teachers' contracts" from the cancellation power of a special board of control or the SRC; whereas section 642–A(a)(3) more broadly excludes all "[c]ollective bargaining agreements," including those relating to teachers and education support personnel, from the cancellation power of a distressed non-first class school district. We fail to see how the General Assembly's exemption of CBAs from the cancellation power of certain classes of distressed school districts evidences its intent that the SRC, which is only relevant in distressed school districts of the first class, impliedly maintains this power.

Further, the General Assembly simply had no reason to amend section 693(a)(1) since between 1959, when this section was added to the School Code, and 2012, when section 642–A was added, no party had taken the position, nor had any court ruled, that "teachers' contracts" includes CBAs. Indeed, PFT alleges in its brief that the SRC unsuccessfully lobbied the General Assembly in 2012 for an amendment to the School Code allowing it to unilaterally impose its terms on union employees.

Additionally, in March 2014, the SRC filed an application for leave with our Supreme Court seeking to file as original process an exclusive jurisdiction complaint for declaratory judgment, but the same

---

**28.** It can be equally argued that an express provision regarding CBAs was unnecessary given the exclusion of "teachers' contracts" in section 693(a)(1).

was denied by order dated June 26, 2014.[29] In this complaint, the SRC sought a declaration that it had the right, following expiration of the CBA with PFT, to unilaterally implement changes in various types of work rules and practices, subjects that had been historically set forth in the CBA but were not mandatory subjects of bargaining.[30] The SRC cited a need for clarity following this Court's decision in *Coatesville Area School District v. Coatesville Area Teachers' Association*, 978 A.2d 413 (Pa.Cmwlth.2009), *appeal denied*, 605 Pa. 677, 989 A.2d 10 (2010), which prohibited a public employer from implementing changes to non-mandatory subjects of bargaining in the interim between CBAs.[31]

Then–Chief Justice Castille issued a dissenting statement. Most significantly, he noted that Act 46 and the declaration of distress under section 691 of the School Code "triggered a total change in the governance of the School District...." *School Reform Commission*, 95 A.3d at 270. He observed that the SRC "has broad powers that no other governing body of a school district in Pennsylvania possesses," *id.*, and included the following detailed analysis of those broad powers:

Section 696 of Act 1998–46 granted the SRC sweeping powers, including the power to avoid strictures typically placed on a school district with respect to staffing. For example, the SRC was authorized to close or reconstitute schools, including reassigning, suspending or dismissing professional employees notwithstanding other provisions of the Public School Code. Additionally, the SRC was authorized to suspend professional employees without regard to the School Code provision relating to seniority preferences. See, 24 P.S. § 6–696(i)(6) and (7).

Section 696 also radically shifted the balance of power in the collective bargaining process. Employees are prohibited from striking while the School District is under SRC control. See 24 P.S. § 6–696(*l*). Section 696 also granted management more authority, stating that the SRC is not required to engage in collective bargaining negotiations with respect to a host of issues, including reductions in the work force, staffing patterns and assignments, and contracts with third parties for the provision of

29. *School Reform Commission v. Philadelphia Federation of Teachers*, —— Pa. ——, 95 A.3d 269 (2014).

30. For example, the SRC sought to reduce the role that seniority played in the assignment and transfer of teachers at the beginning of, and during, the school year, and in the order of layoffs and recalls from layoffs; eliminate a deadline for issuing layoff notices; relax minimum staffing requirements for professionals, such as counselors, librarians, and teachers; give the school principal the ability to direct the uses that teachers make of preparation time periods; and permit the School District to contract with a third party to provide educational services.

31. In *Coatesville*, the school district included a provision in an expired CBA relating to extra pay for teachers for extra-duty work related to extracurricular activities based on

years of experience, a non-mandatory subject of bargaining. After the CBA expired, the school district eliminated or combined extra-duty positions involving extracurricular activities due to budget restraints and the teachers' union filed grievances. The arbitrator ruled in favor of the union, finding this provision to be a mandatory subject of bargaining by virtue of its inclusion in the expired CBA and its impact on wages, hours, and terms and conditions of employment. A common pleas court denied the school district's petition to vacate the arbitrator's award and this Court affirmed, holding that "there can be no change in the *status quo* during the interim between bargaining agreements" and that a school district "cannot change the *status quo* by unilaterally stripping from the contract bargained-for provisions." *Id.* at 418.

goods and services. See 24 P.S. § 6–696(k)(2).

The General Assembly altered how litigation with respect to certain Act 1998–46 issues would proceed. The General Assembly removed certain Act 1998–46 disputes from the ordinary adjudication process, stating that '[t]he Pennsylvania Supreme Court shall have exclusive jurisdiction to hear any challenge to or to render a declaratory judgment concerning the constitutionality of sections 691(c) and 696 of the act and issues related to collective bargaining arising under those sections.' Act 1998–46, § 27.

*Id.* at 270.

While not ruling on the merits of the SRC's complaint seeking to impose new terms and conditions of employment, in delineating all of the significant changes section 696 effectuated for the SRC, including the shift in the balance of power in the collective bargaining process, nowhere in this recitation by then-Chief Justice Castille is there recognition of a right to cancel a CBA via section 696. Such a significant change as the right to cancel a CBA would presumably have been duly noted by then-Chief Justice Castille in this detailed overview. Instead, section 696 is noted for prohibiting employees from striking while the SRC is in place and that the SRC is not required to engage in collective bargaining negotiations regarding a host of issues. Then–Chief Justice Castille also noted that the SRC acknowledged in its complaint that it had "the duty to maintain the *status quo* with respect to mandatory subjects of bargaining after the

expiration of a CBA." *Id.* at 271. The learned Justice Baer joined in this dissenting statement.

In any event, as noted above, there is no language in section 693(a)(1) or 696 empowering the SRC to unilaterally impose new economic terms and conditions of employment on a bargaining unit. Without this express language, we cannot find that PERA has been superseded on this point and it requires that the parties continue to bargain until they reach a point of impasse. Contrary to SRC's argument, section 28(a) of Act 46, which added section 696 to the School Code, does not repeal PERA; rather, this section merely states that PERA is "repealed insofar as it is inconsistent with the provisions of this Act." [32] Presumably, this limited repeal was due to the fact that, as noted above, section 696(k)(2) of the School Code modified certain provisions of PERA pertaining to mandatory and permissive subjects of collective bargaining and section 696(*l*) eliminated the right of employees to strike afforded under section 1003 of PERA, 43 P.S. § 1101.1003.[33] By rendering the issues in section 696(k)(2) relating to third-party contracts, reductions in force, and staffing patterns and assignments permissive subjects of bargaining, the General Assembly created a facial inconsistency with PERA, which requires public employers to bargain over wages, hours, and other terms and conditions of employment. In such a case, the repeal language in section 28(a) of Act 46 causes Act 46 to supersede PERA, but only with respect to those issues. No such inconsistency exists in this case.

---

**32.** Again, this particular section of Act 46 is not codified in Purdon's.

**33.** Section 1003 states, in pertinent part, that "[i]f a strike by public employes occurs after the collective bargaining processes set forth in sections 801 and 802 of Article VIII of this

act have been completely utilized and exhausted, it shall not be prohibited unless or until such a strike creates a clear and present danger or threat to the health, safety or welfare of the public." 43 P.S. § 1101.1003.

## Conclusion

This Court is cognizant of the dire financial situation which the District currently faces and the SRC's extensive efforts to achieve the overall goal of properly and adequately meeting the educational needs of the students. There have been numerous difficult decisions that the SRC has been forced to make in an effort to overcome these economic hurdles, including a one-third reduction in staff and the closing of 31 schools in recent years. We are also cognizant of, and commend, the efforts of both the District and its employees to reach amicable resolutions in the past, as evidenced by multiple CBAs and one-year extensions since the SRC assumed control, as well as extensive negotiations with PFT over the past 21 months towards a new CBA. We also recognize that the SRC's actions have been aimed at effecting needed economies in the District's schools to provide the necessary education to its students.

However, despite these earnest efforts by the SRC, we cannot find that the legislature has provided the means expressly required to pursue the current path chosen by the SRC, i.e., unilaterally imposing upon the PFT new economic terms and conditions of employment under an expired CBA when neither of the parties contend that an impasse exists and such has not been raised as an issue before this Court. The requisite authority of the SRC to cancel a CBA and unilaterally impose new terms and conditions of employment is not present in the relevant statutory provisions discussed above, and this is underscored by former Chief Justice Castille's detailed overview of the significant and sweeping changes of section 696 in *School Reform Commission*. When then-Chief Justice Castille set forth the salient provisions of section 696, he stated that they "radically shifted the balance of pow-

er in the collective bargaining process." *Id.* at 270. Then-Chief Justice Castille also recognized that the SRC is not required to engage in collective bargaining negotiations on a host of issues. However, glaringly absent therefrom is a reference to a provision which expressly gives the SRC the right to cancel a CBA. Nor can such an inference be drawn from the legislative history that preceded adoption of these provisions.

PERA has been repealed only to the extent that it is inconsistent with the Act 46 provisions; otherwise, it remains intact. Act 46, with the addition of section 696 of the School Code and the incorporation of section 693, created school reform commissions, provided them with certain enumerated powers, such as the power to impose a temporary personnel salary schedule while *status quo* negotiations continue, and, as noted above, removed a limited number of items that were previously considered mandatory subjects of bargaining. However, section 701 of PERA still requires mandatory bargaining over wages, hours, and other terms and conditions of employment, including the issues herein related to health care coverage, substitute teacher *per diem* rate, legal fund contributions, sick leave, short-term disability leave, and termination pay benefits. Act 46 and PERA are not inconsistent with each other in these regards and the latter governs the parties' actions on these issues.

To effectuate its desired means, the SRC must look to the General Assembly to enact legislation providing it with the authority to proceed with unilateral modifications that alter an expired CBA (or the *status quo* ) in the absence of an impasse. Because the legislature has not granted such authority, and in the proper exercise of judicial restraint, we must find that PFT established a clear right to relief on

the merits which was sufficient to warrant the entry of a permanent injunction.[34]

 Accordingly, the order of the trial court is affirmed, on other grounds as stated above.[35]

Judge COHN JUBELIRER did not participate in this decision.

### ORDER

AND NOW, this 22nd day of January, 2015, the order of the Court of Common Pleas of Philadelphia County, dated October 27, 2014, is hereby affirmed.

---

**34.** In its brief, PFT further alleges that adoption of the SRC's flawed interpretation of sections 693 and 696 of the School Code would render those provisions unconstitutional. More specifically, PFT alleges that the SRC's interpretation violates the Contract Clauses of the United States and Pennsylvania Constitutions (U.S. Const. art. I, § 10 and Pa. Const. art. I, § 17, respectively) and would amount to an unlawful delegation of legislative authority. The Pennsylvania AFL–CIO raises identical allegations in its *amicus* brief. However, based upon our determination above, we need not reach these issues.

**35.** An appellate court may affirm the trial court for grounds different than those relied upon by the trial court where other grounds for affirmance exist. *Evans v. Thomas Jefferson University*, 81 A.3d 1062, 1072 (Pa. Cmwlth.2013).