**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, JJ.**

| | | |
|---|---|---|
| PHILADELPHIA FEDERATION OF TEACHERS, AFT, LOCAL 3, AFL-CIO AND JERRY JORDAN, | : | No. 31 EAP 2015 |
| | : | |
| | : | Appeal from the Order of the |
| Appellees | : | Commonwealth Court entered on |
| | : | 1/22/15 at 1951 C.D. 2014, affirming the |
| | : | Final Injunction Order entered on |
| v. | : | 10/27/14 in the Court of Common Pleas, |
| | : | Philadelphia County, Civil Division at |
| | : | No. 01842, October Term, 2014 |
| SCHOOL DISTRICT OF PHILADELPHIA, | : | |
| THE SCHOOL REFORM COMMISSION, | : | |
| WILLIAM J. GREEN, FEATHER | : | ARGUED: May 11, 2016 |
| HOUSTOUN, FARA JIMENEZ, | : | |
| MARJORIE NEFF, AND SYLVIA SIMMS, | : | |
| IN THEIR OFFICIAL CAPACITIES AS | : | |
| MEMBERS OF THE SCHOOL REFORM | : | |
| COMMISSION, AND DR. WILLIAM R. | : | |
| HITE, JR., IN HIS OFFICIAL CAPACITY | : | |
| AS THE SUPERINTENDENT OF | : | |
| SCHOOLS, SCHOOL DISTRICT OF | : | |
| PHILADELPHIA, | : | |
| | : | |
| Appellants | : | |


*OPINION*


**CHIEF JUSTICE SAYLOR**                **DECIDED: August 15, 2016**


This appeal concerns whether power is invested in a school reform commission, under a statutory regime designed to facilitate rehabilitation of financially distressed school districts, to unilaterally alter terms and conditions of employment for teachers whose interests are represented by a bargaining unit.

In 1959, the General Assembly enacted the Distressed School Law,[1] amending the Public School Code of 1949,[2] and providing for special boards of control to govern school districts deemed to be financially distressed.  *See* 24 P.S. §§6-692 (repealed), 6-693.  Of particular relevance to the present appeal, Section 693 of the enactment conferred upon on such boards the power to:

> cancel or to renegotiate any contract *other than teachers' contracts* to which the board or the school district is a party, if such cancellation or renegotiation of contract will effect needed economies in the operation of the district's schools.

*Id.* §6-693(a)(1) (emphasis added).

In 1998, the Legislature implemented additional measures specific to distressed school districts of the first class -- *i.e.*, the School District of Philadelphia (the "District") -- by adding Section 696 to the School Code.[3]  Among other provisions that had the effect of affording the Commonwealth an expanded role in the governance of financially-distressed school districts of the first class, the legislation, as amended as of October 2001,[4] provided for the establishment of a five-member school reform commission, within 30 days after the issuance of a declaration of distress by the Secretary of

---

[1] Act of Dec. 15, 1959, P.L. 1842, No. 675 (as amended 24 P.S. §§6-691 - 6-695).

[2] Act of March 10, 1949, P.L. 30, No. 14 (as amended 24 P.S. §§1-101 – 27-2702) (the "School Code").

[3] *See* Act of April 27, 1998, P.L. 270, No. 46 ("Act 46") (implementing modifications throughout the School Code, including, in Section 3, the addition of Section 696).

[4] *See* Act of Oct. 30, 2001, P.L. 828, No. 83, §1 ("Act 83").

Education, to assume the responsibility for the operation, management and educational program of the district. *See* 24 P.S. §6-696(a), (e)(1).[5]

Of particular relevance here, Section 696(i) conferred upon a school reform commission the powers afforded to special boards of control under Section 693(a)(1). *See id.* §6-696(i). Thus, derivatively, a school reform commission has the ability, in delineated circumstances, to "cancel or to renegotiate any contract other than teachers' contracts to which the board or the school district is a party[.]" *Id.* §6-693(a)(1); *see also id.* §6-696(i).

Within its subsection (k), Section 696 also imposed a number of requirements and restrictions upon collective bargaining between the distressed district and employee bargaining units, *see id.* §6-696(k), while repealing the Public Employe Relations Act,[6] to the extent of any inconsistency. *See* Act 46, §28(a). Notably, as originally enacted in 1998, Section 696(k)(5) stated that nothing in subsection (k) "shall eliminate, supersede or preempt any provision of an existing collective bargaining agreement until the expiration of the agreement unless otherwise authorized by law." 24 P.S. §6-696(k)(5) (superseded). In the 2001 amendments, however, the Legislature added language stating that such qualification pertained "[e]xcept as specifically provided in section 693." *Id.* (as amended by Act 83). Via subsection (l), the General Assembly also prohibited school employees from striking during the tenure of a school reform commission. *See id.* §6-696(l).

---

[5] Per the statute, four members of a school reform commission initially are appointed by the Governor, and one member is appointed by the mayor of the city coterminous with the distressed first-class school district. *See* 24 P.S. §6-696(a). After a period of three years, the mayor assumes appointment authority over one of the positions initially filled by the Governor. *See id.* §6-696(b)(iii).

[6] Act of July 23, 1970, P.L. 563, No. 195 (as amended 43 P.S. §§1101.101 – 1101.2301) ("PERA").

In December 2001, the Secretary of Education issued a declaration of financial distress pertaining to the District, and a school reform commission (the "SRC" or the "Commission") was constituted and assumed responsibility for the District's operations, management, and educational program, per Section 696 of the School Code. Throughout the ensuing years, the SRC and appellee, the Philadelphia Federation of Teachers, AFT, Local 3, AFL-CIO (the "Union"),[7] negotiated several collective bargaining agreements, the most recent of which was effective from September 2009 through August 2012, and extended through August 2013. For some period thereafter, the parties adhered to the terms of the expired agreement, consistent with the general, labor-law protocol. *See In re Appeal of Cumberland Valley Sch. Dist.*, 483 Pa. 134, 143, 394 A.2d 946, 951 (1978).

In 2014, the SRC sought leave to file an original jurisdiction complaint in this Court, seeking a declaration that it had the power to unilaterally modify work practices and rules that, under Section 696(k)(2), lay outside the scope of mandatory bargaining. The Court denied such request in June 2014. *See SRC v. Phila. Fed'n of Teachers*, 626 Pa. 115, 95 A.3d 269 (2014) (*per curiam*).[8]

Several months later, the SRC adopted "Resolution SRC-1," entitled, "Implementation of Modified Economic Terms with [the Union]; Cancellation of Collective Bargaining Agreement." The instrument explained that the District's longstanding and extreme financial crisis continued, despite "significant and historic cost-reduction measures," including dozens of school closures, thousands of employee

---

[7] For convenience, and consistent with the parties' submissions, our reference to the term "the Union" generally encompasses its president and trustee *ad litem*, Jerry Jordan, who also presently is an appellee.

[8] Former Chief Justice Castille issued a dissenting statement, joined by Justice Baer. *See id.* at 116-21, 95 A.3d at 269-72 (Castille, C.J., dissenting).

layoffs, a prolonged freeze on charter-school expansion, and substantial wage and benefit concessions from employee organizations. Resolution SRC-1, at 1 (Oct. 6, 2014). According to the document, the District's operating budget remained insufficient to provide adequate funding for essential services.

The resolution further described an ongoing multi-year negotiations process, referred to as a "marathon of collective bargaining," between the District and the Union with the assistance of mediators from the Pennsylvania State Bureau of Mediation, which had yet to culminate in an agreement. *Id.* In the Commission's judgment, it related, curtailment of benefits for the employees, and modification of some other terms and conditions of employment, was necessary to effect needed economies in school operations. *See id.*

For these reasons, the SRC invoked Sections 693(a)(1) of the School Code, as incorporated into Section 696(i), to "make specific limited changes and to implement . . . modified economic terms and conditions for employees in the bargaining units represented by the [Union], consistent with economic terms proposed in negotiations, while maintaining all other existing terms and conditions to the extent required by law[.]"[9] *Id.* at 2. The Commission predicted that the changes would save about $44

---

[9] The specific modifications included:

> changes to medical benefits, including replacing the existing medical plan administered by Independence Blue Cross with a less expensive plan deemed by the School District to be comparable in coverage, requiring employee contributions toward medical premiums, imposing a surcharge for coverage of spouses who have access to medical benefits provided by their own employers, and eliminating opt-out payments; instituting a new School District-administered program providing for dental, optical, and prescription drug benefits; eliminating contributions to the [Union] Health and Welfare Fund and to the [Union] Legal Services Trust Fund;

(continued…)

million in 2014 through 2015 and $198 million over four years. Ultimately, the resolution purported to cancel the most recent collective bargaining agreement between the District and the Union, to the extent that it continued to govern the parties' relations.

Contemporaneous with the issuance of Resolution SRC-1, the Commission, the District, and the Department of Education lodged a declaratory judgment action in the Commonwealth Court. The plaintiffs asked that court to uphold the imposition of the new economic terms and conditions as being authorized by applicable law.

The Union responded with a grievance protesting the SRC's actions and seeking arbitration, an unfair labor practice charge filed before the Pennsylvania Labor Relations Board, and a complaint in equity for temporary restraining order and preliminary injunctive relief. The complaint sought solely to preserve the status quo until the parties concluded the anticipated labor arbitration of their dispute and attained resolution of the unfair labor practice charge. Throughout its various submissions to the common pleas court, the Union took the position that the restriction, within Section 693(a)(1), upon the cancellation or renegotiation of "teachers' contracts" plainly encompassed contracts that govern teachers' employment, such as a collective bargaining agreement establishing the terms and conditions for such engagement. The Union also maintained that the bargaining efforts between it and the District had not reached an impasse.

The SRC urged the common pleas court to stay the proceedings before it, so that material legal issues could be adjudicated in the Commonwealth Court. Further, the Commission took the position that the injunction requested by the Union, if granted,

_____

(…continued)

> creating a uniform *per diem* rate for certified teachers; changing wage continuation benefits; and modifying termination pay benefits for new employees[.]

*Id.* at 2.

would cause irreparable harm by requiring the District to "stop restoring crucial funds to the schools to pay for books, school supplies as basic as paper and art supplies, and most importantly, much needed staff, such as counselors, reading specialists, and other specialists and programs to be devoted to the District's most at-risk students." Defendants' Memorandum of Law in Opposition to Plaintiffs' Petition for a Temporary Restraining Order and Preliminary Injunctive Relief ("Defendants' Memorandum") in *Phila. Federation of Teachers, AFT, Local 3, AFL-CIO v. Sch. Dist. of Phila.*, No. 01842 Oct. Term 2014 (C.P. Phila), at 3.

On the merits, the SRC maintained that, since a collective bargaining agreement is a contract, there could be no question that such an agreement was subject to cancellation to facilitate needed economies in the operation of the District's schools. *See* 24 P.S. §6-693(a)(1). The need, the Commission contended, was also undeniable, given a projected funding shortfall for the next fiscal year of $71 million, heralded in part by the two major cost drivers of employee health care costs and state-mandated contributions to employee pensions.

The SRC depicted Section 696 as "redr[awing] the map for collective bargaining between the School District and its unions, curtailing union rights and conferring exceptional powers on the SRC and the School District to cope with the challenges posed by fiscally distressed circumstances." Defendants' Memorandum in *Phila. Federation of Teachers, AFT, Local 3, AFL-CIO v. Sch. Dist. of Phila.*, No. 01842 Oct. Term 2014 (C.P. Phila), at 5. To the degree that the Union would question the Commission's imposition of new terms and conditions, as contrasted with cancellation as such, the SRC asserted that the power to cancel a collective bargaining agreement "carries with it the power to implement new cost-saving terms and conditions." *Id.* at 15.

The SRC also responded to the position that Section 693(a)(1)'s exception for "teachers' contracts" might encompass collective bargaining agreements involving teachers. In this regard, the Commission took that position that the term has long had a specific and definite meaning in Pennsylvania law, referring only to individual contracts that each school district has with its teachers, as required by the Teachers' Tenure Act of 1937.[10] *See id.* at 30.

After a hearing, the common pleas court granted the preliminary injunction, which it later converted to a permanent one upon the parties' stipulation. With regard to the phrase "teachers' contracts" as employed in Section 693(a)(1), the court found that collective bargaining agreements had been referred to as such by courts in a long line of cases.[11] Accordingly, the court found that the right of cancellation under Sections

---

[10] Act of April 6, 1937, P.L. 213, No. 52 (previously codified at 24 P.S. §1126) (repealed).

Notably, by the time of the enactment of Section 693 of the Distressed School Law, material provisions of the 1937 Teachers' Tenure Act cited by the SRC had been modified and ultimately repealed, *inter alia*, via the School Code. *See, e.g.*, Act of March 10, 1949, P.L. 30, art. XXVII, §2701. Presumably on this account, the Commission has refined its arguments before this Court to focus on provisions of the School Code. *See* Brief for Appellants at 32 (asserting that the term "teachers' contracts" refers to "the individual teacher tenure contracts that each school district has with its tenured teachers, as mandated by section 1121 of the School Code, 24 P.S. §11-1121").

[11] In support, the court cited: *Wyland v. PSERB*, 669 A.2d 1098, 1100 (Pa. Cmwlth. 1996) (referring to "teachers' contract negotiations" in connection with a discussion of a labor dispute); *Union City Area Sch. Dist. v. UCBR*, 61 Pa. Cmwlth. 494, 497 n.2, 434 A.2d 239, 241 n.2 (1981) (specifying that the term "teacher contract" would be employed as a convention signifying a collective bargaining agreement), *rev'd on other grounds sub nom. Union City Sch. Dist. v. UCBR*, 499 Pa. 548, 454 A.2d 522 (1982); *Phila. Fed'n of Teachers, Local No. 3 v. Thomas*, 62 Pa. Cmwlth. 286, 298, 436 A.2d 1228, 1234 (1981) (referring to labor disputes involving teachers' unions as "teachers contract disputes"); *Bethel Park Sch. Dist. v. Bethel Park Fed'n of Teachers, Local 1607, Am. Fed'n of Teachers, AFL-CIO*, 51 Pa. Cmwlth. 104, 106, 414 A.2d 145, 147 (continued…)

693(a)(1) and 696(i) did not reach such agreements. The court also reasoned that – on account of a prescription within Section 693 that "the special board of control shall have power to require the board of directors within sixty (60) days" to implement measures encompassing the cancellation power, 24 P.S. §6-693(a) -- the cancellation power could only have been exercised within 60 days after the December 2001 declaration of distress.

On the SRC's appeal, the Commonwealth Court affirmed. *See Phila. Fed'n of Teachers, AFT, Local 3, AFL-CIO v. Sch. Dist. of Phila.*, 109 A.3d 298 (Pa. Cmwlth. 2015) (*en banc*). Initially, the court disagreed with the common pleas court's determination that the Commission's Section 693 powers had to be exercised within 60 days after it assumed control of the District. *See id.* at 303 n.5 (noting the impracticability of requiring school reform commissions to exercise all powers under Section 693 within 60 days after their creation and indicating that "it appears that this limitation applied to the time period within which a school district's board of directors must comply with the directives of a special board of control to revise a budget").[12]

_____

(…continued)
(1980) (referring to "teacher contract disputes"); and *Phila. Fed'n of Teachers, Local No. 3, AFT, AFL-CIO v. Bd. of Ed. of Sch. Dist. of Phila.*, 458 Pa. 342, 343-44, 327 A.2d 47, 48-49 (1974) (referencing a collective bargaining agreement involving teachers as a contract). *See also Hazleton Area Sch. Dist. v. Hazleton Area Educ. Ass'n*, 47 Pa. Cmwlth. 255, 257, 408 A.2d 544, 545 (1979) (characterizing a collective bargaining agreement as a "teacher's contract").

[12] Although the Union maintains its arguments along these lines in its present submissions, it is apparent from the statute that the 60-day limitation does not directly constrain the SRC's actions, but rather, is directed to those of the subordinated school board. In other words, the prescription that "the special board of control shall have power to require the board of directors within sixty (60) days" to implement measures encompassing the cancellation power, 24 P.S. §6-693(a), requires the board of directors to proceed with a special board's directives within the 60-day period.

(continued…)

Nevertheless, in broad terms, the intermediate court credited the common pleas court's holding that Sections 693(a)(1) and 696(i) did not permit the Commission to cancel the collective bargaining agreement or impose new terms and conditions of employment upon teachers whose rights and interests were subjects of that agreement.

The Commonwealth Court proceeded to offer a general discussion of the collective bargaining process in the public employment setting, under PERA, encompassing the employees' right to strike in the event of an impasse. *See id.* at 303-04 (citing *Curley v. Bd. of Sch. Dirs. of Greater Johnstown Sch. Dist.*, 163 Pa. Cmwlth. 648, 659, 641 A.2d 719, 724-25 (1994)). The intermediate court observed that PERA establishes mandatory subjects of bargaining, encompassing wages, hours, and other terms and conditions of employment, *see* 43 P.S. §1101.701, and delineates matters that are not subject to bargaining, including matters of inherent managerial policy, *see id.* §1101.702. In this regard, the court highlighted, from the outset, that Act 46 repealed PERA *only* to the extent of inconsistencies with the revised provisions of the School Code. *See* Act 46, §28(a).

The Commonwealth Court then reviewed the various relevant amendments to the School Code, and in particular, the addition of Section 696 via Act 46. *See Phila. Fed'n of Teachers*, 109 A.3d at 306-08. In this respect, the intermediate court emphasized that Section 696(k) "clearly conveys that distressed first-class school districts shall engage in collective bargaining," subject to defined exceptions, but "does

---

(…continued)

This conclusion is consistent with the natural phrasing of the controlling passage and the last-antecedent rule of statutory construction. *See Rendell v. Pa. State Ethics Comm'n*, 603 Pa. 292, 304, 983 A.2d 708, 715 (2009). Moreover, as the Commonwealth Court observed, such reading accounts for the extraordinary learning and planning curves facing a newly-constituted special board charged with assuming control of the affairs of, and operating, a school district until a sound financial structure is reestablished. *See* 24 P.S. §6-693.

not give the SRC the right to cancel a [collective bargaining agreement] or unilaterally impose new terms." *Id.* at 308. Furthermore, the court highlighted the 2001 repeal of Section 696(k)(1), which had stated a rule contrary to the ordinary labor-law protocol requiring parties to maintain the status quo after the expiration of a collective bargaining agreement. *See* 24 P.S. §6-696(k)(1) (repealed) ("Whether or not a declaration of distress has been made under section 691(c), a collective bargaining agreement in effect on the effective date of this section shall not be extended and shall have no force or effect beyond the existing term of the contract notwithstanding any other law to the contrary."). From this repealer, the intermediate court discerned a "clear intent by the legislature not to alter the *status quo* requirement." *Phila. Fed'n of Teachers*, 109 A.3d at 309.

The analysis then segued into a discussion of employers' options upon a bargaining impasse, including, according to the Commonwealth Court at least, the unilateral imposition of new terms and conditions of engagement for employees. *See id.* at 309-11.[13] In any event, however, the intermediate court explained that the parties were in agreement that an impasse had not been declared or reached in the present circumstances. *See id.* at 311 n.19.

With regard to the impact of the Distressed School Law, and Section 693(a)(1) in particular, the Commonwealth Court declined to focus on the central question presented to it concerning whether the term "teachers' contracts," as used in Section 693(a)(1),

---

[13] This analysis has provoked extensive criticism from the Union's *amici*, the American Federation of State, County and Municipal Employees ("AFSCME") District Council 33, Service Employees International Union Local 32BJ, AFSCME District Council 47, and Gas Works Employees Union Local 686, Utility Workers Union of America (collectively "*Amici*"). *See* Brief for *Amici* at 20-41. We find that a resolution of this difference is unnecessary to the disposition of the present appeal; thus, our opinion should in no way be read as an endorsement of the Commonwealth Court's position on the subject of employer options upon an impasse.

subsumes collective bargaining agreements. *See, e.g., id.* at 314 (discussing the parties' arguments on the point and indicating that, "[i]n any event, section 693(a)(1) is not controlling as it does not specifically address [collective bargaining agreements], override the relevant provisions of PERA, or empower the SRC to unilaterally impose new economic terms and conditions of employment."). Rather, adopting a broader frame of reference, the intermediate court appeared to take the position that collective bargaining agreements simply are not "contracts" at all for purposes of Section 693(a)(1), given that the Legislature had "reference[d] [collective bargaining agreements and contracts] individually in . . . sections 693 and 696." *Id.* at 312.[14]

According to the intermediate court, the legislative history of the various relevant amendments to the School Code also lent no support to the SRC's position that it had the authority to cancel collective bargaining agreements. *See id.* at 316. While the

---

[14] This rationale is undeveloped and unclear, since it contains no contextual references concerning the specific use of the terms in the relevant sections.

Notably, for example, as the Commonwealth Court otherwise highlighted, Section 693 contains no internal reference to collective bargaining agreements. Plainly, therefore, Section 693 itself does not specifically differentiate between "contracts" and "collective bargaining agreements." Moreover, in Section 696(k)(4), immediately after having delineated -- in subsections (k)(2) and (3) -- a series of requirements and restrictions relative to collective bargaining agreements, the Legislature specified that "[a] provision in *any contract* in effect on the date of the declaration of distress under this subsection that is in conflict with this subsection shall be discontinued *in any new or renewed contract*." 24 P.S. §6-696(k)(4) (emphases added). By its location and effect, such provision pertaining to "any contract" seems rather overtly to be intended not to distinguish -- but to *embody* -- collective bargaining agreements.

Additionally, it is worth noting at this juncture that neither any party nor any *amicus* supports the position that a collective bargaining agreement is not, in the first instance, a contract for purposes of Section 693(a)(1). *See generally Kozura v. Tulpehocken Area Sch. Dist.*, 568 Pa. 64, 71, 791 A.2d 1169, 1174 (2002) (referencing the "fundamental principle that a collective bargaining agreement constitutes a contract").

intermediate court did not say so directly, its specific treatment of the remarks of various legislators suggested that they appeared to understand the restraint upon cancellation powers relative to "teachers' contracts," in Section 693(a)(1), as creating a distinction between a school reform commission's ability to cancel collective bargaining agreements as to teachers, versus cancellation relative to other employees.[15]

The Commonwealth Court further emphasized the absence, in Section 693, of any specific reference to collective bargaining, any terms overriding relevant provisions of PERA, or any language empowering a special board of control unilaterally to impose new economic terms and conditions of employment. *See, e.g., id.* at 314. The court also suggested that the approach of replacing a selected number of the provisions of a collective bargaining agreement, while retaining the remainder, simply was not tantamount to cancellation in any event. *See id.* at 316.

Next, the Commonwealth Court considered an argument by the SRC that, via 2012 amendments to the School Code,[16] the General Assembly solidified the position

---

[15] *See id.* at 315 n.25 (reflecting the remark of then-Representative Michael Veon that, under Act 46, "you could in fact negate existing contracts for janitors, bus drivers, cafeteria workers" (quoting H. Legis. Journal, Oct. 23, 2001, at 1899)); *see also id.* (referencing the remarks of then-Representative H. William DeWeese, as follows: "If you vote to concur tonight, you are voting to lacerate the jobs of many hundreds of bus drivers and cafeteria workers," but "the teachers will probably be protected" (quoting H. Legis. Journal, Oct. 23, 2001, at 1904)); *cf. id.* (highlighting then-Senator Vincent Fumo's comment, associated with the 2001 amendments to the School Code: "Thank God, you protected the contracts of the teachers[.]" (quoting Senate Legis. Journal, Oct. 23, 2001, at 1013)); *id.* at 315 n.26 (reflecting an assurance by Act 46's primary sponsor, then-Majority Leader John Perzel when asked in discussions of the Act 46 amendments about the bill's effect "on existing union contracts," that "this does not abrogate the existing union contract whatsoever" (quoting House Legislative Journal, April 21, 1998, at 917)).

[16] *See* Act of July 12, 2012, P.L. 1142, No. 141 (supplementing and amending various provisions of the School Code, including, relevantly, the addition of Section 602-A).

that the term "teachers' contracts" excludes collective bargaining agreements. These amendments, pertaining to certain school districts *other than those of the first class*, *see* 24 P.S. §6-602-A, conferred a contract cancellation power upon such districts, subject to the express proviso that "[c]ollective bargaining agreements are specifically exempt." *Id.* §6-642-A(a)(3). The intermediate court, however, declined to infer, from this specific exemption in connection with a cancellation power, that the General Assembly must have intended collective bargaining agreements to be subsumed within a school reform commission's cancellation power under Sections 696(i) and 693(a)(1). *See Phila. Fed'n of Teachers,* 109 A.3d at 317. In this regard and otherwise, the court emphasized that, since the time when Section 693 was promulgated in 1959, no party or court ever had asserted that collective bargaining agreements were subject to the cancellation power under the statute. *See id.*[17]

We allowed the SRC's appeal to consider whether the Legislature conferred upon the entity the power to cancel collective bargaining agreements. Our review of the matter of statutory construction is plenary. *Oliver v. City of Pittsburgh*, 608 Pa. 386, 393, 11 A.3d 960, 964 (2011).

Preliminarily, we observe that the litigants offer many lines of argumentation in their briefs. The dispositive issue, we find, lies in the construction of the term "teachers' contracts" in Section 693(a)(1) of the School Code, upon which our treatment, below, focuses.

---

[17] The Commonwealth Court also drew a supportive inference on this point from the dissenting statement, authored by former Chief Justice Castille and joined by Justice Baer, which was issued in connection with this Court's denial in 2014 of the SRC's application for leave to file an original jurisdiction complaint. *See supra* note 8. Although certainly such statement stands as a developed explication of the position taken by two Justices, we do not find the exercise of deriving inferences from an expression by a Court minority to be a useful one.

Presently, the SRC maintains that collective bargaining agreements are "contracts" subject to the general cancellation power under Section 693(a)(1), and that the exception for "teachers' contracts" does not apply. 24 P.S. §6-693(a)(1). In support of this proposition, the Commission explains that the Distressed School Law predated PERA's authorization of collective bargaining for public employees by some 11 years. Accordingly, in the time period in which the Distressed School Law was promulgated, the term "teacher's contract" generally was employed, in judicial decisions and otherwise, to refer to the individual contracts for professional employees required under Section 1121 of the School Code, 24 P.S. §11-1121.[18]

For this reason, the SRC portrays the pivotal phrase as a term of art, the meaning of which should be confined closely according to such limited and fixed understanding. *See* 1 Pa.C.S. §1903(a) ("[T]echnical words and phrases and such others as have acquired a peculiar and appropriate meaning . . . shall be construed according to such peculiar and appropriate meaning[.]"). Furthermore, because a collective bargaining agreement is a contract with a union, the Commission claims that it cannot be a "*teachers'* contract." 24 P.S. §6-693(a)(1) (emphasis added). It is the SRC's position that, given the importance of teacher tenure contracts as reflected in the various statutory protections against arbitrary termination and otherwise, *see, e.g.*, *id.*

---

[18] In this respect, the Commission references, *inter alia*: *Wilchenski v. Sch. Dist. of Borough of Throop*, 383 Pa. 394, 396, 119 A.2d 510, 512 (1956) (employing the term "teacher's contract" to refer to an individual employment agreement between a school district and a teacher); *Appeal of Watson*, 377 Pa. 495, 500, 105 A.2d 576, 579 (1954) (same); and *McCandless Twp. v. Wylie*, 375 Pa. 378, 384, 100 A.2d 590, 593 (1953) (same). *See* Brief for Appellants at 33 (citing these and other cases).

Parenthetically, the term "professional employe," as employed in Section 1121, encompasses a range of professionals in addition to teachers. *See* 24 P.S. §11-1101(1).

§11-1127 (establishing procedures governing dismissal of tenured professional employees), it should be clear that the General Assembly merely wished to prevent such contracts from being cancelled absent the specified procedural protections.

To the degree there is any ambiguity, the SRC invokes additional principles of statutory construction. *See generally Oliver*, 608 Pa. at 394, 11 A.3d at 965 (explaining that, in determining the meaning of ambiguous statutory language, courts may resort to the tools of statutory construction). In terms of such considerations, the Commission asserts that the factors concerning the "occasion and necessity for the statute," the "object to be obtained," and the "former law, if any," 1 Pa.C.S. §1921(c)(1), (4), (5), all support its position, given that public school teachers in Pennsylvania lacked collective bargaining rights when the Distressed School Law was promulgated.

Citing *Smith v. School District of Township of Darby*, 388 Pa. 301, 130 A.2d 661 (1957), the SRC also asserts that the "teachers' contract" exception to its cancellation prerogative should be construed narrowly in its favor. *See id.* at 314, 130 A.2d at 668-69 ("School authorities must be given broad discretionary powers to ensure a better education for the children of this Commonwealth and any restrictions on the exercise of these powers must be strictly construed on the basis that the public interest predominates and private interests are subordinate thereto."). Furthermore, the Commission references the presumption, in statutory construction, that, "when a court of last resort has construed the language used in a statute, the General Assembly in subsequent statutes on the same subject matter intends the same construction to be placed upon such language." 1 Pa.C.S. §1922(4).

Additionally, the SRC contends that the Legislature, via various amendments to the School Code, has reaffirmed its power to cancel a collective bargaining agreement several times. In this regard, the Commission references: Act 46's repeal of PERA

insofar as it was inconsistent with Section 693(a)(1) and 696(i), *see* Act 46, §28; the 2001 exemption of the SRC's Section 693 powers from 696(k)(5)'s ban on negating collective bargaining agreements, *see* 24 P.S. §6-696(k)(5); and the 2012 amendments' focus on non-first-class school districts in curtailing the cancellation power relative to collective bargaining agreements, *see* 24 P.S. §6-642-A(a)(3).

In the broadest frame, the SRC maintains that its actions have been eminently reasonable in view of the District's financial plight. *See, e.g.*, Brief for Appellants at 51 ("The ability to hire enough staff, to keep the schools clean and safe, to buy books and other school supplies and offer sports, art, music and other essential programs . . . must take precedence over the private interests of unions and their members in retaining a health benefits package so generous that it has become all but extinct in the marketplace."). Furthermore, the Commission portrays the curtailment of benefits that it has attempted to implement as modest. Finally, the Commission reiterates that the right to a public education is rooted in this Commonwealth's Constitution, *see Sch. Dist. of Wilkinsburg v. Wilkinsburg Educ. Ass'n*, 542 Pa. 335, 343, 667 A.2d 5, 9 (1995) (observing that "public education in Pennsylvania is a fundamental right" (citing PA. CONST. art. III, §14)), while stressing that "any interpretation of legislative pronouncements relating to the public educational system must be reviewed in context with the General Assembly's responsibility to provide for a 'thorough and efficient system' for the benefit of our youth." *Sch. Dist. of Phila. v. Twer*, 498 Pa. 429, 435, 447 A.2d 222, 225 (1982) (quoting PA. CONST. art. III, §14).

The Union and its *amici*, for their part, acknowledge that the interests of students are of paramount concern, but they differ with the SRC's perspective that the impairment of the collective bargaining process best serves such interests. *See, e.g.*, Brief for *Amici* at 10 n.6 (characterizing collective bargaining agreements as "important

to preserve ongoing relationships and, in the case of teachers, to preserve the long-term relationships and livelihoods of persons who are the life-blood of the principal service public schools are meant to provide – educating students"). Throughout their submissions, they also emphasize that the conferral of a cancellation power relative to collective bargaining renders ensuing contracts illusory and restores the potential for substantial unrest. *See, e.g.*, Brief for Appellees at 52 ("The conclusion necessitated by the SRC's interpretation would destroy any semblance of collective bargaining, as no agreement arrived at the negotiation table would have any enforceability."); Brief for *Amici* at 23-24 (explaining that PERA was enacted to foster stability in the public labor relations arena). According to the Union, moreover, it already has offered substantial concessions at the bargaining table in recognition of the District's financial circumstances.

As to the relevant matter of statutory construction, from the point of view of the Union and *Amici*, the "teachers' contracts" exception in Section 693(a)(1) plainly subsumes collective bargaining agreements, which are contracts governing teachers' employment with a school district. *See* Brief for Appellees at 35; *accord* Brief for *Amici* at 10 (referring to a teachers' contract as "a contract of some kind that covers the employment of teachers"). Indeed, they view it as common parlance -- amidst the general public as well as in judicial opinions -- to refer to a teachers' collective bargaining agreement as a teachers' contract. *See supra* note 11. Furthermore, the Union and *Amici* highlight Section 696(k)(4)'s apparent reference to a collective bargaining agreement as a "contract." *See supra* note 14.

Responding to the SRC's position that the term "teachers' contract" refers only to individual teacher tenure contracts, the Union explains that the relevant statutes themselves do not contain such specific term. Moreover, the Union and *Amici* regard it

as tangential at best that various courts may have used what they regard as an umbrella phrase to refer to discrete examples of individual teacher's contracts. *See, e.g.*, Brief for Appellees at 32 ("The mere fact that these courts used this phrase when interpreting the Teachers' Tenure Act and discussing individual teacher tenure contracts has no relevance to Section 6-693(a)(1) -- an entirely different provision in the Public School Code, enacted decades after the Teachers' Tenure Act.").

On this point, *Amici* offer the following elaboration:

> *Amici* tend to agree with the SRC's point (as far as it goes) that it is unlikely that the General Assembly, when it enacted that portion of the School Code giving distressed Districts the ability to reject "teachers' contracts" in 1959, thought that term (which is more descriptive than it is a term of art) applied to collective bargaining agreements. But that is not because of any significant difference between teachers' employment contracts and collective bargaining agreements involving teachers units. Lack of conscious association of teachers with [collective bargaining agreements] would have stemmed simply from the scarcity, at that time, of [collective bargaining agreements] covering teachers' units. It would take another 11 years before public school teachers were granted in PERA an effective right to organize and engage in collective bargaining. But, since that time, with teacher [collective bargaining agreements] having become quite prevalent, it is far more apt to associate the nontechnical label "teachers' contracts" with collective bargaining agreements, as it was unlikely [that it was] the particular *form* of the agreement that mattered to legislators in 1959; rather, it would be the *purpose* of the agreement – *any* sort of contract governing the terms and conditions of employment of public school teachers – that would have concerned the General Assembly in excepting this type of contract from the ability of Districts under supervision to "cancel contracts."

Brief for *Amici* at 7-9 (footnotes omitted); *accord id.* at 10 ("The evil addressed by [Section 693(a)(1)] was the need to protect teachers' contractual employment conditions

from the broad power distressed school districts were afforded to cancel burdensome contracts.").

According to the Union and its *amici*, the SRC's position is further undermined by a line of judicial decisions determining that, through PERA's conferral of collective bargaining rights, individual employment contracts have been subsumed within and negated by existing collective bargaining agreements to the extent there may be inconsistencies. *See Leechburg Area Sch. Dist. v. Leechburg Educ. Ass'n*, 475 Pa. 413, 420, 380 A.2d 1203, 1206 (1977) (plurality); *Tunkhannock Area Sch. Dist. v. Tunkhannock Area Educ. Ass'n*, 992 A.2d 956, 960 (Pa. Cmwlth. 2010). They also maintain that Act 46 specifically restated the collective bargaining obligations of the District and the Union, *see, e.g.*, 24 P.S. §6-696(k) (specifying that "[c]ollective bargaining between employes and the school district of the first class shall be conducted in accordance with this subsection"), albeit while imposing additional regulation upon the process, *see id. See generally* Brief for *Amici* at 14 ("Having already set forth an extensive list of procedures and rights attaching to collective bargaining in Subsection (k), it is unlikely the legislature would have remained silent, had it wanted to confer this power, about the most significant right the SRC claims to possess – to cancel the contract it had already negotiated."). Furthermore, the Union and its *amici* stress, there is nothing on the face of Act 46 that is inconsistent with PERA's grant of authority to public school employees to "organize, form, join or assist in employe organizations or to engage in lawful concerted activities for the purpose of collective bargaining or other mutual aid and protection or to bargain collectively through representatives of their own free choice . . . ." 43 P.S. §1101.401.

The Union and *Amici* believe that the legislative history of relevant amendments to the Public School Code support their position. *See, e.g.*, Brief for Appellees at 59-60

("The clear import of [an] exchange [on the floor of the House of Representatives] is that Pennsylvania legislators were concerned that the [2001] amendment preserved only teachers' collective bargaining agreements in the District, but not collective bargaining agreements of non-professional employees such as janitors, bus drivers and food-service workers."); *see also supra* note 15.

In terms of the 2012 amendments to the School Code, the Union and *Amici* urge that there was no cause or incentive for the Legislature to alter Section 693(a)(1), since there was no evidence that the statute had been misunderstood as pertaining to collective bargaining agreements in the first instance. *See* Brief for Appellees at 38 ("[B]etween 1959, when Section 6-693(a)(1) was added to the Public School Code, and 2012, when the Legislature passed Act 141, no party had taken the position, nor had any court ruled, that 'teachers' contracts' were not 'teachers' collective bargaining agreements.'").

Having considered the respective positions presented, we agree with the Union and its *amici* that the exception to the SRC's statutory contract-cancellation power pertaining to "teachers' contracts" subsumes collective bargaining agreements at least insofar as they pertain to teachers. *See* 24 P.S. §6-693(a)(1). Such association should come as no surprise, since these agreements serve, essentially, as master contracts governing the terms and conditions for such professionals' engagement. *See generally Skeim v. Indep. Sch. Dist. No. 115*, 234 N.W.2d 806, 810 (Minn. 1975) (referring to a collective bargaining agreement as a "master teachers' contract"); 20 WILLISTON ON CONTRACTS § 55:19 (4th ed. 2010) (depicting collective bargaining agreements as a form of master contract). This broader connotation of the phrase "teachers' contract" is

reflected both in common parlance,[19] as well as in numerous judicial decisions, *see, e.g.*, *supra* note 11.[20]

Certainly, as the parties and *Amici* have discussed at length, members of the General Assembly may not have focused upon collective bargaining agreements at the time the Distressed School Law was enacted, given that there was no right at that time to collective bargaining in the public sector. Nevertheless, the clear intent was to protect the core relationship establishing terms and conditions for teachers' employment, as was then memorialized via teacher tenure contracts. Accordingly, upon the advent of public-sector collective bargaining, it is entirely fitting that the term "teachers' contract" has been otherwise applied to collective bargaining agreements – which now embody the essential professional relationship. In the circumstances, we do not view our task, in interpreting broad statutory language, as "the hopeless one of ascertaining what the legislators who passed the law would have decided had they reconvened to consider [this] particular case[]." *Beecham v. United States*, 511 U.S.

---

[19] For example, with great frequency the news media refers to collective bargaining agreements involving teachers as "teachers' contracts" (with and without the possessive punctuation). *See, e.g.*, Dustin Luca, *Salem Teachers' Contract Has New Perks*, SALEM NEWS, July 4, 2016; David Mekeel, *I-LEAD Releases Information on Budget, Teachers Contract*, READING EAGLE, June 24, 2016; Denise M. Bonilla, *Lindenhurst School Board Approves Teachers Contract*, NEWSDAY, May 26, 2016; Robert McCoppin, *Debate Intensifies Over 10-Year Teachers Contract in Palatine*, CHI. TRIB., May 17, 2016.

[20] In this respect, we reject the SRC's position that the presumption pertaining to previously-construed terms applies. *See* 1 Pa.C.S. §1922(4). This Court did not "construe" the term "teachers' contracts" in any of the cases cited by the Commission. *See supra* note 18. Rather, the language was employed, without specific focus or definition, as a straightforward reference to the subject matter at hand. *See, e.g.*, *Wilchenski*, 383 Pa. at 396, 119 A.2d at 512. No attempt was made to delineate whether or not the language might have had broader connotations.

368, 374, 114 S. Ct. 1669, 1672 (1994).  Rather, we take the more practicable approach of adhering to the ordinary meaning of the enacted text.  *See id.*

In terms of the policy considerations involved, we agree with the Commission that the remedial nature of Sections 693 and 696 of the School Code is very important, but we also find there to be a countervailing policy, in that PERA was enacted to mitigate the impingements on government operations caused by labor strife.  *See generally PLRB v. State College Area Sch. Dist.*, 461 Pa. 494, 502, 337 A.2d 262, 266 (1975) (explaining that the pre-PERA circumstances -- in which public employees were prohibited from striking and lacked the right to bargain collectively -- fostered a "chaotic climate that resulted from this obviously intolerable situation" and heralded the creation of a government commission which found a "need for collective bargaining to restore harmony in the public sector and to eliminate the numerous illegal strikes and the widespread labor unrest").  Indeed, the Union and *Amici* aptly explain that investiture in the SRC of a unilateral right of cancellation, particularly while depriving employees of the right to strike, *see* 24 P.S. §6-696(l), so diminishes the Union's position that the term "bargaining" would no longer seem to be a fair depiction of ensuing discussions between the parties.[21]

Nothing else in the SRC's presentation persuades us that we should depart from the interpretation of "teachers' contracts" as subsuming collective bargaining agreements involving teachers.  *See generally Karoly v. Mancuso*, 619 Pa. 486, 510-11, 65 A.3d 301, 316 (2013) ("As a general rule, the best indication of the General

---

[21] Along these lines, we also agree with the Union and *Amici* that a unilateral cancellation right is in tension with Section 696(k)'s specific prescription for collective bargaining.  In this regard and otherwise, we do realize that Section 693(a)(1)'s focus on "teachers'" contracts, as opposed to contracts involving school employees at large, fosters somewhat of a disconnect.

Assembly's intent in enacting a statute may be found in its plain language." (citation omitted)).  Along these lines, we agree with the Union and *Amici* that the repeal of PERA in the present context was a limited one that did not extend to the present circumstances on account of the teachers'-contracts exception to cancellation powers, *see* Act 46, §28; the 2001 exemption of the SRC's Section 693 powers from Section 696(k)(5)'s ban on negating collective bargaining agreements appears to pertain to other aspects of Section 693;[22] and the withholding of cancellation power for collective bargaining agreements from non-first-class school districts in the 2012 amendments is not mutually exclusive with the understanding that such power already had been withheld from special boards of control relative to teachers per Section 693(a)(1) of the School Code and, derivatively, school reform commissions under Section 696(i).

We hold, at least insofar as teachers are concerned, that collective bargaining agreements are "teachers' contracts" which are excepted from a school reform commission's cancellation powers.

The order of the Commonwealth Court is affirmed, albeit on different grounds.


Justices Baer, Todd, Donohue, Dougherty and Wecht join the opinion.

---

[22] For example, Section 693(a)(5) empowers a school reform commission to dispense with the services of such nonprofessional employees as are unnecessary for the economic operation of the school system.  *See* 24 P.S. §6-693(a)(5).