School District of Philadelphia,    :
           Appellant    :
                       :
         v.              :
                       :

Philadelphia Federation of Teachers,   :   No. 2301 C.D. 2015
AFT, Local 3, AFL-CIO           :   Argued: October 17, 2016


BEFORE:   HONORABLE RENÉE COHN JUBELIRER, Judge
               HONORABLE JOSEPH M. COSGROVE, Judge
               HONORABLE JAMES GARDNER COLINS, Senior Judge


OPINION
BY JUDGE COSGROVE                  FILED: June 8, 2017


      The School District of Philadelphia (District) appeals from an order of the Court of Common Pleas of Philadelphia County (trial court) which denied the District's Motion to Vacate an Arbitration Award (Award) that sustained the grievance of the Philadelphia Federation of Teachers (Union). Upon review, we affirm.

## I. BACKGROUND

      Anticipating a funding deficit for the 2013-2014 academic year, the District laid off several thousand employees in June of 2013 and closed 31 schools. Every school counselor was laid off. During the summer of 2013, the District received additional funds which were enough to recall some, but not all, of the counselors laid off. Due to the District's financial constraints, it believed insufficient funds existed to place a full-time counselor in the smallest schools. By late fall of 2013, every school had a counselor assigned to it, with the smaller

schools in the District sharing a counselor. The District recalled counselors without preference for seniority and placed them in the schools they served the prior academic year.

The Union filed a grievance alleging the collective bargaining agreement (CBA), which expired on August 31, 2013, required the recall of counselors in order of seniority and they be given their pick of school on the same basis. The Union grievance also alleged the CBA required the recall of counselors in sufficient numbers to place a counselor full-time in each school, regardless of school size. The matter went to arbitration, and hearings were held on September 10, 2014 and January 20, 2015. Arbitrator Ralph Colflesh, Jr. (Arbitrator) issued his Award on June 29, 2015, sustaining the Union's grievance in its entirety.

The District filed a timely Petition to Vacate or Modify the Award with the trial court, which the trial court denied on November 10, 2015. The District appealed to this Court.

## II. ISSUES

As set forth in its brief, the District raises two questions on appeal:

(1) [w]hether the essence test and Section 7302(d)(2) of the Uniform Arbitration Act[1] [UAA] require[s] the [] Award to be vacated in its entirety because, once the parties' [A]greement expired, Act 46 [][2] and decades of precedent gave the School District the right to recall and reassign counselors without regard to numerical quotas

---

[1] 42 Pa. C.S. § 7302(d)(2).

[2] Act of April 27, 1998, P.L. 270, 24 P.S. § 6-696. Act 46 added Section 696 to the Public School Code of 1949, Act of March 10, 1949, P.L. 30, *as amended*, 24 P.S. §§ 1-101 – 27-2702.

or seniority, such matters having become non-mandatory subjects of bargaining by virtue of Section 696(k)(2)[3] of [Act 46]; and

(2) [w]hether the Award as to the two seniority-based grievances should be vacated under the essence test where the [A]greement was devoid of language creating any such seniority rights, no cognizable past practice existed, and the Arbitrator rewrote the [A]greement rather than interpreting it.

(Appellant's Br. at 1-2.)

## III. DISCUSSION

### A. Act 46

The District argues Section 696(k)(2) of Act 46, when viewed in light of prior decisions of our Supreme Court, mandates that this Court vacate the Award because once the CBA expired, the provisions of Act 46 controlled, thereby enabling the District to impose new non-mandatory terms unilaterally, without engaging in prior bargaining under the CBA. (Appellant's Br. at 21.)

Section 696(k)(2) of Act 46 provides in pertinent part:

(2) No distressed school district of the first class shall be required to engage in collective bargaining negotiations or enter into memoranda of understanding or other agreements regarding any of the following issues:

…

(ii) Decisions related to reductions in force.

(iii) Staffing patterns and assignments, class schedules, academic calendar, places of instruction, pupil assessment and teacher preparation time.

24 P.S. §6-696(k)(2)(ii),(iii).

___

[3] 24 P.S. §6-696(k)(2)(i)-(vi).

In support of its argument, the District cites *City of Pittsburgh v. Pennsylvania Labor Relations Board*, 653 A.2d 1210 (Pa. 1995), which held that a public employer is entitled to act unilaterally after expiration of a collective bargaining agreement with respect to an issue that is a non-mandatory subject of bargaining.

In *City of Pittsburgh*, the city, a party to the collective bargaining agreement with the labor union, enacted an ordinance establishing a revised pension benefit plan. Such action was required for participation in the Municipal Pension Plan Funding Standard and Recovery Act (Act 205),[4] which provided state financial assistance to municipalities whose pension systems were determined to be financially distressed. The union filed a charge alleging the city violated the Public Employe Relations Act (PERA)[5] in implementing a revised pension benefit plan without first entering into mandatory negotiations with the union.

The essential issue raised by *City of Pittsburgh* was whether the provisions of Act 205 conflicted with PERA and, if a conflict existed, how must it be resolved. *City of Pittsburgh,* 653 A.2d at 1212. Section 607(e) of Act 205 explicitly provides that "[a] revised benefit plan for newly hired municipal employees shall be developed with consultation with representatives of the collective bargaining unit applicable to the affected type of municipal employee, if any, and shall be within the scope of collective bargaining pursuant to the applicable law subsequent to the establishment of the revised benefit plan." 53 P.S. §895.607(e).

---

[4] Act of December 18, 1984, P.L. 1005, *as amended,* 53 P.S. §§895.101-895.1003.

[5] Public Employe Relations Act, Act of July 23, 1970, P.L. 563, *as amended,* 43 P.S. §§1101.101-1101.2301.

4

Section 701 of PERA mandates bargaining "with respect to wages, hours, and other terms and conditions of employment." 43 P.S. §1101.701. The parties did not disagree that pensions were included within this mandated bargaining. *City of Pittsburgh,* 653 A.2d at 1212. Section 702 of PERA provides that public employers need not bargain over matters of inherent managerial policy. 43 P.S. §1101.702. Participation in the Act 205 recovery program is not mandatory. *City of Pittsburgh,* 653 A.2d at 1214.

The Supreme Court read Section 607(e) of Act 205 together with Section 702 of PERA and concluded the city's decision to avail itself of the assistance provided by Act 205 constituted an inherently managerial decision. *Id.* at 1213-1214. Because Section 607(e) of Act 205 allowed the city to establish a revised plan without mandating labor negotiations, the legislature effectively brought that activity within the ambit of Section 702 (inherent managerial activity). *Id.* at 1214. The legislative creation of the opportunity to participate gave the city authority to participate fully, even when doing so expanded the scope of inherently managerial activity. *Id.*

Here, the District argues *City of Pittsburgh* is analogous because that decision similarly concerned a financially-distressed entity and a specialized financial distress statute. (Appellant's Br. at 29.) The labor contract at issue in *City of Pittsburgh* was set to expire December 31, 1987.

Similarly, the District here reasons that its CBA with the Union likewise expired and the decision to recall counselors out of seniority order, assign them to schools without regard to seniority, and require smaller schools share a single counselor constituted non-mandatory subjects of bargaining within the District's inherent managerial authority. (Appellant's Br. at 25-26.)

5

*City of Pittsburgh* is distinguishable from the present matter. The provisions of Section 696 of Act 46 become operative upon the declaration that a school district of the first class is distressed.[6] The District has no ability to opt in or out once it has been declared distressed. The District was so declared in 2001. The city of Pittsburgh's decision to "avail itself of the assistance offered by Act 205 [was] an inherently managerial decision." *City of Pittsburgh,* 653 A.2d at 1213. By acting within the mandatory constraints of Section 696 of Act 46, the District cannot be said to have made an inherently managerial decision.

More compelling than *City of Pittsburgh* is this Court's decision in *Philadelphia Federation of Teachers v. School District of Philadelphia,* 109 A.3d 298 (Pa. Cmwlth. 2015) (*PFT*),[7] which addressed the very argument presented by the District here.

In *PFT*, this Court noted that "there is no language in section 693(a)(1)[8] or [section] 696 empowering the [School Reform Commission] to unilaterally impose new economic terms and conditions of employment on a

---

[6] Section 696(a) of Act 46 states in pertinent part:

Within thirty (30) days of a declaration by the Secretary of Education that a school district of the first class is distressed under section 691(c), a School Reform Commission shall be established consisting of four members initially appointed by the Governor and one member initially appointed by the mayor of the city coterminous with the school district.

24 P.S. §6-696(a).

[7] Petition for Allowance of Appeal was granted in *PFT* by the Pennsylvania Supreme Court on August 10, 2015. The Court affirmed on other grounds. *Philadelphia Federation of Teachers, AFT, Local 3, AFL-CIO v. School District of Philadelphia*, 144 A.3d 1281 (Pa. 2016).

[8] Section 693 of the Public School Code was added by the Act of December 15, 1959, P.L. 1842, *as amended*, 24 P.S. § 6-693.

6

bargaining unit." *PFT,* 109 A.3d at 319. PERA was only repealed to the extent it was inconsistent with the Act 46 provisions, otherwise, it remains intact. *Id.* at 320. "To effectuate its desired means, the [District] must look to the General Assembly to enact legislation providing it with the authority to proceed with unilateral modifications that alter an expired CBA (or the *status quo*) in the absence of an impasse." *Id.*

Here, the District attempts to distinguish the current matter from *PFT* by stating that the terms at issue are not economic terms or conditions of employment. We disagree. The Arbitrator found there could be no argument that the requirement to employ one counselor on a full-time basis in each school was an economic provision. (R.R. at 178a.)

Both Naomi Wyatt (Wyatt), the District's chief talent officer, and Matthew Stanski, the District's chief financial officer, testified extensively about the District's dire financial condition and the resultant need to layoff all counselors in the District. (R.R. at 145a-150a.) According to Wyatt, the District lacked sufficient funding to call back all the counselors previously employed and the "decision was made to make sure that the schools had counseling service that would be the most effective in a limited staffing environment." (R.R. at 148a.) Wyatt testified that principals were permitted to select from those counselors previously assigned to that school. *Id.* That testimony does not render the decision regarding which counselors would be recalled purely managerial. If that decision had no economic component to it, all counselors on layoff would have been recalled.

In sustaining the Union's grievance, the Arbitrator in part relied on *Coatesville Area School District v. Coatesville Area Teachers'*

*Association/Pennsylvania Education Association*, 978 A.2d 413 (Pa. Cmwlth. 2009), a decision which the District urges us to overturn.

In *Coatesville*, the school district tried to unilaterally reduce the number of extracurricular positions set forth in a nominally-expired contract while the parties were in the process of negotiating a new contract. The district argued the *status quo* doctrine did not apply to non-mandatory subjects of bargaining because they were matters of inherent managerial discretion. This Court concluded that, although the district was free to negotiate extracurricular activities in the subsequent contract, it could not change the *status quo* by unilaterally stripping the bargained-for provisions from the expired contract. *Coatesville,* 978 A.2d at 418. While a public employer is not statutorily required to negotiate matters of inherent managerial rights, if it chooses to do so, it is bound by the terms of the CBA. *Id.* at 417.

Here, Section 696(k) of Act 46 provides that "[c]ollective bargaining between employes and the school district of the first class shall be conducted in accordance with this subsection…" 24 P.S. §6-696(k). While Section 696(k)(2)(iii) clearly provides that the District is not required to engage in collective bargaining negotiations on the issue of staffing patterns and assignments, there is no express prohibition against it. The District has not persuaded us that *Coatesville* should be overturned and we reiterate its conclusion that an employer must maintain the *status quo* of an expired contract until a new contract has been negotiated. *Coatesville,* 978 A.2d at 419. As such, the parties have a duty to maintain the *status quo* after the contract expires where no new contract is in place. *See Luzerne Intermediate Unit No. 18 v. Luzerne Intermediate Education Association*, 89 A.3d 319, 328 (Pa. Cmwlth. 2014). Only once the parties have

reached an impasse is the burden to maintain the *status quo* eliminated. *Textron Lycoming v. Unemployment Compensation Board of Review,* 604 A.2d 1216, 1220 (Pa. Cmwlth. 1992).

At present, the parties have not declared an impasse; therefore, the CBA cannot be set aside and new terms put in place by the District. We conclude, therefore, that the *status quo* must be maintained with regard to the terms of the expired CBA and we turn to the question of whether those items in dispute can be found within the terms of the CBA and the Award passes the essence test.

## B. Essence Test

The District argues that the CBA does not contain any language granting laid-off counselors a right to be recalled or assigned to a school in seniority order. The District asserts that the Union President admitted this lack of seniority-based language in the CBA at the arbitration hearing. Thus, the District asserts the seniority-based grievances are not arbitrable and the Arbitrator's reason for granting these grievances cannot rationally be derived from the CBA.

An arbitrator's award must draw its essence from the collective bargaining agreement, giving rise to what is recognized as the "essence test." The essence test is the standard by which courts will review grievance arbitration awards arising under Section 401 of the PERA. *Westmoreland Intermediate Unit #7 v. Classroom Assistants Educational Support Personal Association, PSEA/NEA,* 939 A.2d 855, 863 (Pa. 2007).

The reviewing court must conduct a two-pronged analysis: (1) the court determines if the issue, as properly defined, is within the terms of the collective bargaining agreement; and (2) if the issue is embraced by the agreement,

9

and thus appropriately before the arbitrator, the arbitrator's award will be upheld if the arbitrator's interpretation can rationally be derived from the collective bargaining agreement. *State System of Higher Education (Cheyney University) v. State College University Professional Association (PSEA-NEA)*, 743 A.2d 405, 413 (Pa. 1999). The court will only vacate an arbitrator's award where the award indisputably and genuinely is without foundation in, or fails to logically flow from, the collective bargaining agreement. *Id.*

The first prong of the essence test requires a determination of whether the issue, as properly defined, is within the terms of the CBA. The Union presents a grievance regarding the District's failure to recall counselors by order of seniority, to allow assignment by seniority, and to ensure that there was one counselor assigned to each of the District's schools.

The District argues the CBA is devoid of language creating any right of school counselors to be recalled or to be reassigned in seniority order. (District's Br. at 41.) In light of this fact, it is argued, the Award cannot pass the essence test because the issues as defined are not within the terms of the CBA and the Arbitrator's interpretation cannot rationally be derived from the CBA. *Id.*

Article IX of the CBA governs employment security. This article provides in pertinent part:

A. Seniority

…

3. Wherever, in this Agreement, reference is made to seniority as the basis for decision, it shall mean that the person with the highest seniority of the type of seniority shall receive preference.

…

B. Layoff/Recall

10

...

> 3. When and if layoffs are effected, it is agreed that senior employees in a position and/or classification shall have the right to take layoff in lieu of an employee with less seniority in the position and/or classification.

(R.R. at 162a.)

After concluding Sections A and B of the CBA survived the expiration of the CBA, the Arbitrator analyzed those provisions and determined that recall was necessarily included in the provision for layoffs. (R.R. at 179a-180a.) The Arbitrator found that "[b]y allowing more senior employees to take layoff, Section B, in effect, covers recalls when they occur and permits more senior employees when they are on layoff to continue to choose layoff in deference to more junior employees" or to accept the recall. *Id.* at 180a. The allowance for employees to choose to take a layoff is done by seniority therefore it rationally follows that when recalling those same employees from layoff, senior employees would be given first choice to accept the recall or remain on layoff. *Id.* The arbitrator was thus persuaded that recalls, like layoffs, were controlled by seniority as were assignments following recall. *Id.* at 181a.

It is true the CBA does not expressly state that recalls are to be made by seniority and those recalled given preference of assignment in the same manner. Jerry Jordan (Jordan), president for the Union, admitted in his testimony before the Arbitrator that language regarding recalls was not in the contract. (R.R. at 104a-105a, 110a.) This omission does not, however, represent the death knell to the Union's claims. Silence, or absence of language dealing specifically with the issue, does not prevent an Award from drawing its essence from the Agreement. *School District of City of Allentown v. Hotel and Restaurant Employees*

11

*International Union, Local No. 391, AFL-CIO,* 654 A.2d 86, 89 (Pa. Cmwlth. 1995).

Jordan testified extensively at the hearing as to prior CBAs of the parties and contract negotiations which had taken place. At one time a separate CBA existed for each bargaining unit. (R.R. at 99a.) In 2000, the District proposed a "thin contract," which would be reduced "[b]y weight, as well as the language included in the contract." *Id.* The Article IX language of the CBA, concerning recall and layoff, did not change in agreements negotiated from 2004 through 2013. *Id.* at 100a-101a. The administration's position was that certain items such as recalls and layoffs were in the Public School Code and the contract could be made thinner if the parties relied on the Public School Code to guide them. *Id.* at 105a. Practice between the parties had always been to effect recall according to Section 1125.1[9] of the Public School Code. *Id.* at 105a. Arlene Kempin, chief personnel officer for the Union, also testified that, in her thirty-plus years with the District, layoff was always by inverse seniority and recall was by seniority. *Id.* at 125a.

During the most recent contract negotiations, the District proposed reductions in force would be accomplished in a manner that would best meet the

---

[9] Section 1125.1 provides in pertinent part as follows:

> (a) Professional employes shall be suspended under section 1124 (relating to causes for suspension) in inverse order of seniority within the school entity of current employment.
> …
> (c) A school entity shall realign its professional staff so as to insure that more senior employes are provided with the opportunity to fill positions for which they are certificated and which are being filled by less senior employes.

24 P.S. §11-1125.1, *added by* the Act of November 20, 1979, P.L. 465.

needs of the District and recalls would be at the District's discretion and in a manner to best meet the needs of the District. (R.R. at 96a.) The Union did not agree to this proposal. *Id.* at 97a. The District also proposed the deletion of language requiring a counselor be assigned to each school. *Id.* The Union disagreed with this proposal, as well. *Id.* Another District proposal rejected by the Union would have granted the District "full authority to act unilaterally with respect to any matter not expressly set forth in this agreement, including the subject matter set forth in [24 P.S. §6-696(k)] of the Public School Code." *Id.* at 114a.

The Arbitrator was ultimately persuaded that "recall, like layoffs, are [sic] controlled by seniority as ae [sic] assignments following recall." (R.R. at 181a.) "Given the clear, consistent, known, and regular application of seniority by the District in layoff and recalls, [the Arbitrator was] persuaded that Sections A and B bound the parties to that application. And, because that application was part of the *status quo* when the CBA nominally expired following its extension, it continued in full force and effect in the fall of 2013 and therefore could not be abrogated by the District." *Id.*

It seems illogical at best that the District would attempt to negotiate these terms if it did not believe they were already encompassed by the CBA. We are thus similarly persuaded that recalls and layoffs by seniority, and assignments following recall, are issues found within the terms of the CBA and the first prong of the essence test was met.

The second prong is met if the arbitrator's interpretation can rationally be derived from the CBA. The Arbitrator's determination of the intention of the contracting parties as evidenced by the CBA and the circumstances surrounding its

13

execution is to be respected by the judiciary if the interpretation can in any rational way be derived from the CBA, viewed in light of its language, context, and any other indicia of the parties' intentions. *Midland Borough School District v. Midland Education Association, PSEA,* 616 A.2d 633, 636 (Pa. 1992), quoting *Community College of Beaver County v. Community College of Beaver County, Society of the Faculty (PSEA/NEA),* 375 A.2d 1267, 1275 (Pa. 1977). Reliance upon past practices in the face of an ambiguous provision in the CBA is not only permissible, but is an important tool through which the arbitrator may discover the intent of the parties. *Danville Area School District v. Danville Area Education Association, PSEA/NEA*, 754 A.2d 1255, 1262 (Pa. 2000).

The District also argues the "supposed past practice" of recalling counselors in seniority order cannot be relied upon to interpret an ambiguous provision because the language at issue is not the least bit ambiguous. (Appellant's Br. at 50.)

In *Danville*, an arbitrator was asked to interpret a section of a collective bargaining agreement to determine a teacher's retirement benefits. The agreement used a phrase, "years of service in public education" that was not defined in the agreement to determine eligibility for retirement benefits. *Danville,* 754 A.2d at 1258. The arbitrator attempted to discern what the parties meant by the term and looked to the Retirement Code[10] which was used by the parties in the past to give meaning to the term. *Id.* at 1261. The arbitrator also looked to other teachers with similar circumstances and how the term was applied. *Id.* The arbitrator made his decision by deriving the intent of the parties from the

---

[10] Public School Employees' Retirement Code, 24 Pa.C.S. §§ 8101-8535.

agreement, viewed in the light of the school district's past practices with respect to other similarly-situated employees. *Id.*

In the case *sub judice,* the Arbitrator relied on the language of the CBA and the past practices of the parties in making his Award. (R.R. at 179a-181a.) In the undisputed testimony of Jordan, all prior layoffs and recalls by the District were done by seniority. *Id.* at 180a. Since the CBA was silent on the matter of seniority for recalls, the Arbitrator used the past practices of the parties to fill in the blanks. *Id.* As such, it was determined that the District violated the CBA when it failed to recall laid off counselors in seniority order and failed to assign those recalled to their school of preference, and failed to assign at least one counselor to each school on a full-time basis. *Id.* at 181a.

The CBA between the parties had nominally expired at the time of the actions that led to the filing of the grievances. When a situation such as this arises, the *status quo* must be upheld and the CBA is treated as if it were in full force and effect and, therefore, cannot be disregarded by the District. *Coatesville.* A review of the past practices of the parties is the appropriate interpretive tool to be employed when the CBA is silent on the matter. *Danville.* An arbitrator may attempt to discern the intent of the parties and resolve a dispute over contract interpretation, by considering the actions of the parties as evidence of their interpretation of the terms of the CBA. *Id.*

All prior recalls were made according to seniority and, despite the CBA's expiration, the 2013 recalls should have proceeded under the same scheme. We are compelled to point out the obvious – that the parties bargained for binding arbitration. The benefits of binding arbitration would be eroded if the courts assumed a greater role in reviewing arbitration awards. *Danville.* The court does

15

not inquire into whether the arbitrator's decision is reasonable or even manifestly unreasonable but whether the award may in any way be rationally derived from the agreement between the parties. *Id*.

Agreed-upon binding arbitration protects the parties by allowing their disputes to be addressed swiftly and efficiently, outside the judicial process. As such, it assists the administration of justice in such a critical way that courts are loath to interfere except in the most unusual circumstance. In the present matter, the Arbitrator examined the CBA and the circumstances surrounding its execution in order to ascertain the intentions of the parties, and his conclusion must therefore be respected by the judiciary. *Midland Borough.*

For the reasons set forth in this opinion, we affirm the decision of the trial court denying the District's Motion to Vacate the Award.

_____
JOSEPH M. COSGROVE, Judge

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

School District of Philadelphia,  :
      Appellant :
          :
      v.    :
          :
Philadelphia Federation of Teachers, :  No. 2301 C.D. 2015
AFT, Local 3, AFL-CIO   :


# O R D E R


AND NOW, this 8th day of June, 2017, the order of the Court of Common Pleas of Philadelphia County dated November 10, 2015 is AFFIRMED.


            _____
            JOSEPH M. COSGROVE, Judge